# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1308
_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Juan Manuel Chavez-Alvarez, | * | |
| | * | |
| Appellant. | * | |

_____

No. 09-1533
_____

Appeals from the United States
District Court for the
Southern District of Iowa.

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Mayra Elena Mireles, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: November 20, 2009
Filed: February 18, 2010

_____

Before WOLLMAN, JOHN R. GIBSON, and SHEPHERD, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Mayra Elena Mireles and Juan Manuel Chavez-Alvarez were convicted of conspiracy to distribute at least 500 grams of a mixture or substance containing methamphetamine and at least fifty grams of actual methamphetamine, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846. Both appellants challenge the sufficiency of the evidence against them and contend that the district court[1] erred in submitting a willful blindness instruction to the jury. Chavez-Alvarez argues that the transcripts of recorded phone conversations should not have been allowed in the jury room during deliberations. Mireles appeals from the denial of her motions for judgment of acquittal and for a new trial. We affirm.

## I. Background

We state the facts in the light most favorable to the jury verdict. United States v. Jenkins-Watts, 574 F.3d 950, 956 (8th Cir. 2009).

Alejandro Martinez-Garcia managed a methamphetamine ring in Des Moines, Iowa. His brothers sent methamphetamine from Chicago, Illinois, and Martinez-Garcia oversaw the packaging and distribution of the drug in the Des Moines area. Martinez-Garcia received several pounds of methamphetamine each month.

Before distribution, the methamphetamine was cut with dimethyl sulfone (MSM), a dietary supplement for horses that is similar in appearance and texture to methamphetamine. MSM can be purchased in Des Moines and is available at feed

_____

[1]The Honorable Ronald E. Longstaff, United States District Judge for the Southern District of Iowa.

-2-

stores, pet stores, and tack shops. To prepare a half pound of the methamphetamine mixture for distribution, Martinez-Garcia instructed Miguel Avalos to mix 124 grams of MSM with 100 grams of methamphetamine. Cutting the drug with MSM allowed the conspiracy to maximize its profits by increasing the weight of the illegal substance. According to Martinez-Garcia, Mireles and Chavez-Alvarez were in charge of purchasing the MSM.

### A. Mireles's Involvement with the Conspiracy

Martinez-Garcia hired Mireles on several occasions to purchase MSM for him, instructing her to purchase a certain brand that looked similar to methamphetamine. He paid for the MSM, Mireles's travel expenses, and her time. Mireles began purchasing MSM on Martinez-Garcia's behalf shortly after they were introduced in March 2007. Martinez-Garcia testified that the first time he hired Mireles, she traveled to Las Vegas, Nevada, where MSM could be obtained easily. Martinez-Garcia later learned that MSM could be purchased in Minnesota and that Chavez-Alvarez could help obtain it. Upon arriving on her first trip to Minneapolis, Mireles met Chavez-Alvarez, who brought her to the store where she purchased MSM. Mireles testified that she had earlier been directed by Martinez-Garcia to go to "a store like Home Depot."

Mireles traveled to Minneapolis four times to purchase MSM. Martinez-Garcia usually provided a truck and $500 for four, ten-pound buckets of MSM. After purchasing the MSM, Mireles would return to Des Moines and park the truck in front of an ice cream store. Martinez-Garcia later would send someone to pick up the truck. Martinez-Garcia paid her $850 for each trip, though he usually did not distribute the cash payments to Mireles, the payments instead being made by other co-conspirators. Mireles twice drove Martinez-Garcia's vehicle to Chicago. She was paid to do so and brought MSM with her on at least one occasion.

Mireles never asked Martinez-Garcia what purpose the MSM served, and Martinez-Garcia never told her. According to Martinez-Garcia, they did not discuss drugs and Mireles told him that "she didn't want to get involved with drugs; that she would simply cooperate by buying the vitamins." Martinez-Garcia stated that Mireles had asked him what would happen if she was stopped by the police while transporting MSM. He reassured her that there would be no problems. Martinez-Garcia owned one horse, though he maintained that he had not told Mireles of this fact.

Mireles testified that she believed that Martinez-Garcia needed the MSM for his horses and that she would never have agreed to purchase the MSM if she had known it was used to adulterate methamphetamine. Mireles had never seen the horses, nor did she know how many horses Martinez-Garcia owned. Each ten-pound bucket of MSM contained a 160-day supply of the supplement, though Mireles stated that she never paid attention to the label, other than the brand. She testified that she did not know that MSM was available in Des Moines and that if she had, she would not have purchased it. She believed that Martinez-Garcia had hired her because he did not have a driver's license and needed someone to buy the supplement for his horses.

B. Chavez-Alvarez's Involvement with the Conspiracy

Martinez-Garcia offered to pay Chavez-Alvarez $1000 to purchase MSM in Minnesota and deliver it to Des Moines. Martinez-Garcia sought to establish a regular delivery schedule and asked Chavez-Alvarez to purchase and deliver four, ten pound buckets every eight days. He told Chavez-Alvarez that he was willing to pay $1000 for each delivery. Martinez-Garcia testified that he had never discussed drugs or horses with Chavez-Alvarez.

In July 2007, Chavez-Alvarez agreed to purchase and transport MSM. Martinez-Garcia directed Avalos to give Chavez-Alvarez a label from an MSM bucket so that he would know which brand to purchase. Later that month, Martinez-Garcia

wired $500 to Chavez-Alvarez, explaining that he had used an alias to send the money. He told Chavez-Alvarez that the last time he sent Mireles to Minneapolis, she could not purchase MSM at the first store and had to go to a second store. Chavez-Alvarez told Martinez-Garcia that he knew where both stores were, even though neither mentioned the names or locations of the stores.

After Chavez-Alvarez purchased the MSM and drove it to Des Moines, Martinez-Garcia directed him to a drug store parking lot, where he met Avalos and an associate. Both vehicles left the parking lot shortly thereafter and went to an auto parts store parking lot. Avalos went into the store, while his partner stayed with Chavez-Alvarez so that they could exchange the MSM for the $1000 payment. When Avalos returned to the parking lot, the buckets of MSM were in his vehicle and Chavez-Alvarez's vehicle was leaving the parking lot.

Law enforcement officials had been monitoring the exchange. Following the transaction, an Iowa state patrol trooper stopped Chavez-Alvarez for speeding. The trooper testified that the traffic stop was unremarkable and that Chavez-Alvarez cooperated.

## C. Procedural Background

Avalos, Martinez-Garcia, his former girlfriend, and a number of law enforcement officials testified at trial. Law enforcement officials had intercepted Martinez-Garcia's cellular telephone calls from June to August 2007, and the government offered into evidence recordings of relevant intercepted calls involving Mireles and Chavez-Alvarez. Because the conversations were in Spanish, the recordings were translated and transcribed in English. The linguist who verified the transcripts testified that they were accurate.

In submitting the case to the jury, and over the defendants' objections, the district court included a willful blindness instruction, which permitted the jury to find that the defendants acted knowingly if they were "aware of a high probability that he or she was acting in furtherance of a conspiracy to distribute methamphetamine when he or she agreed to obtain and transport MSM to Alejandro Martinez-Garcia, and that he or she deliberately avoided learning the truth." The district court also overruled an objection to the submission of the transcripts to the jury.

## II. Discussion

### A. Sufficiency of the Evidence

Mireles and Chavez-Alvarez contend that the evidence was insufficient to support their convictions. We review the sufficiency of the evidence *de novo*. United States v. Coleman, 584 F.3d 1121, 1125 (8th Cir. 2009). "[W]e will affirm if the record, viewed most favorably to the government, contains substantial evidence supporting the jury's verdict, which means evidence sufficient to prove the elements of the crime beyond a reasonable doubt." United States v. Lopez, 443 F.3d 1026, 1030 (8th Cir. 2006) (en banc).

To convict a defendant of conspiracy to distribute drugs, the government must prove that there was an agreement to distribute drugs, that the defendant knew of the agreement, and that the defendant intentionally joined the agreement. United States v. Benitez, 531 F.3d 711, 716 (8th Cir. 2008). "[A] defendant may be convicted for even a minor role in a conspiracy, so long as the government proves beyond a reasonable doubt that he or she was a member of the conspiracy." Lopez, 443 F.3d at 1030. The elements of conspiracy may be proved by direct or circumstantial evidence, and the jury may "draw reasonable inferences from the evidence presented about what the defendant's state of mind was when he did or said the things presented

in the evidence." United States v. Turner, 583 F.3d 1062, 1067 (8th Cir. 2009) (quoting United States v. Wilson, 103 F.3d 1402, 1406-07 (8th Cir. 1997)).

Mireles and Chavez-Alvarez concede that the government proved the existence of a conspiracy to distribute methamphetamine, but contend that it failed to prove that they knew of and intentionally joined the conspiracy. A defendant's willful blindness may serve as the basis for knowledge if, "in light of certain obvious facts, reasonable inferences support a finding that a defendant's failure to investigate is equivalent to 'burying one's head in the sand.'" United States v. Florez, 368 F.3d 1042, 1044 (8th Cir. 2004). "To act 'knowingly,' therefore, is not necessarily to act only with positive knowledge, but also to act with an awareness of the high probability of the existence of the fact in question. When such awareness is present, 'positive' knowledge is not required." United States v. Graham, 739 F.2d 351, 353 (8th Cir. 1984) (per curiam) (quoting United States v. Jewell, 532 F.2d 697, 700 (9th Cir. 1976) (en banc)). The concept of willful blindness is a limited exception to the requirement of actual knowledge, and the jury may find willful blindness only if the defendant was aware of facts that put him on notice that criminal activity was probably afoot and deliberately failed to make further inquiries, intending to remain ignorant. United States v. Barnhart, 979 F.2d 647, 651-52 (8th Cir. 1992). Accordingly, the government could satisfy its burden of proof by proving that if Mireles and Chavez-Alvarez were not actually aware that they were purchasing and transporting MSM to assist Martinez-Garcia in the distribution methamphetamine, their ignorance was based entirely on a conscious decision to avoid learning the truth.

1. Sufficient Evidence To Convict Mireles

The evidence showed that Mireles either had actual knowledge of the conspiracy or deliberately failed to inquire about it. Martinez-Garcia's testimony that Mireles told him that "she didn't want to get involved with drugs; that she would simply cooperate by buying the vitamins" supports the government's contention that

Mireles had actual knowledge of the conspiracy. If she did not, it was only because she chose not to investigate the facts suggesting that criminal activity was afoot. As noted above, Martinez-Garcia testified that Mireles asked what would happen if she was stopped by law enforcement while transporting the supplement. A jury could infer that if she believed that she had been transporting the MSM for legal purposes, possessing it should not have given her cause for concern. Moreover, the nature of the typical purchase and delivery of MSM was suspicious: Mireles would pick up a vehicle that contained the buy money, drive to Minneapolis, purchase the MSM, return the vehicle to Des Moines, park it at an agreed upon location, and then leave it to be picked up by someone else. She was paid handsomely for her work, usually receiving the cash payments from Martinez-Garcia's associates, whom Mireles had not met before her employment.

The government's evidence undermined Mireles's story that she believed the MSM was used for Martinez-Garcia's horses, the existence of which she had never been told by Martinez-Garcia. Mireles never asked how Martinez-Garcia used the MSM. She also transported a bucket of MSM to Chicago, without questioning why Martinez-Garcia had any need of it there. Similarly, she never inquired whether MSM was available in Des Moines, which likely has feed stores, pet stores, tack shops, and stores "like Home Depot." In light of this evidence, the jury could reasonably determine that Mireles knew of the drug conspiracy and that she intentionally joined it when she purchased and delivered MSM to Martinez-Garcia.

2. Sufficient Evidence To Convict Chavez-Alvarez

The evidence was also sufficient to sustain Chavez-Alvarez's conviction. Martinez-Garcia offered to pay Chavez-Alvarez $1000, every eight days, for driving forty pounds of horse supplement from Minneapolis to Des Moines. Chavez-Alvarez never asked whether Martinez-Garcia owned horses, how the MSM was used, why large quantities of MSM were needed, why the supplement had to be purchased in

Minneapolis, or why Martinez-Garcia was willing to pay $1000 to have it delivered to one of his associates in Des Moines. The circumstances of Chavez-Alvarez's purchase and delivery also indicated a high probability of illegal activity. Martinez-Garcia wired the money using an alias. After arriving in Des Moines, Chavez-Alvarez was directed to a drug store to meet Avalos. The two vehicles left the drug store and met at an auto parts store parking lot, where the exchange of MSM for money occurred. Chavez-Alvarez's calm demeanor during the traffic stop immediately after the exchange was a matter for the jury to consider. The jury was entitled to weigh the evidence, and it reasonably found that if Chavez-Alvarez did not actually know that he was acting in furtherance of a methamphetamine distribution ring, his ignorance was based on his decision not to ask any questions about the suspicious circumstances of his employment.

## B. Willful Blindness Instruction

Mireles's and Chavez-Alvarez's contention that there was no evidentiary basis for the willful blindness instruction fails for the same reasons their challenges to the sufficiency of the evidence fail. As discussed earlier, a willful blindness instruction is appropriate when a defendant claims a lack of guilty knowledge, but the evidence supports an inference of deliberate ignorance. Florez, 368 F.3d at 1044; United States v. Gruenberg, 989 F.2d 971, 974 (8th Cir. 1993). Ignorance is deliberate if the defendant was presented with facts that put him or her on notice that criminal activity was particularly likely, yet the defendant intentionally failed to investigate those facts. Florez, 368 F.3d at 1044; Barnhart, 979 F.2d at 652. As recounted above, the evidence indicated that the defendants were aware that criminal activity was likely afoot, although they did not obtain final confirmation from Martinez-Garcia or the other co-conspirators. Moreover, the instruction was complete: it stated that the jury could not find knowledge if the defendants were "merely negligent, careless or mistaken as to whether [they were] acting in furtherance of a conspiracy" or if they "actually believed that the horse supplement, MSM, that [they] purchased was going

-9-

to be used for Alejandro Martinez-Garcia's horse(s)." We conclude that the instruction was properly given and that it fairly submitted the issue of knowledge to the jury.

## C. Use of Transcripts in Jury Deliberations

Chavez-Alvarez argues that the district court erred when it furnished the jurors with the English-language transcripts of the recorded telephone conversations during deliberations. He contends that the transcripts were cumulative and prejudicial.

The decision to permit the use of transcripts is committed to the district court's discretion, and it is well settled that juries may use translated transcripts of recorded conversations during trial and deliberations. See, e.g., United States v. Placensia, 352 F.3d 1157, 1165 (8th Cir. 2003) (Spanish-language conversations translated to English); United States v. Grajales-Montoya, 117 F.3d 356, 367 (8th Cir. 1997) (same); United States v. Delpit, 94 F.3d 1134, 1147-48 (8th Cir. 1996) ("pig-latinisms" translated to English). Without translation, an English-speaking jury would not have been able to understand the content of recorded conversations that took place in Spanish. Chavez-Alvarez does not contend that the translations were inaccurate or that the speakers were misidentified, and we reject his assertion that allowing the transcripts in the jury room was cumulative. The tapes were properly admitted into evidence, and the transcripts assisted the jury in evaluating that evidence. Thus, the district court did not abuse its discretion in permitting the jury to refer to them during deliberations.

## D. Denial of Motions for Judgment of Acquittal and for a New Trial

Mireles claims that the district court erred in denying her motions for judgment of acquittal and for a new trial, alleging that there was insufficient evidence to convict her of conspiracy. Having determined that the evidence was sufficient to support

Mireles's conviction and the submission of the willful blindness instruction, we affirm the district court's denial of those motions.

## Conclusion

The convictions are affirmed.

_____