# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3791

_____

United States of America,       *
                                     *

           Appellee,         *
                                     *

     v.                     *
                                     *

Phieu Van Nguyen,        *
                                   *

           Appellant.     *

_____

No. 08-3804

_____

Appeals from the United States
District Court for the
Northern District of Iowa.

United States of America,       *
                                     *

           Appellee,         *
                                     *

     v.                     *
                                   *

David Nguyen,          *
                                   *

           Appellant.     *

_____

No. 08-3854
_____

United States of America,        *
        *
        Appellee,        *
        *
    v.        *
        *
Va Thi Nguyen,        *
        *
        Appellant.        *
_____

Submitted: October 22, 2009
Filed: April 2, 2010
_____

Before RILEY, Chief Judge,[1] SMITH and GRUENDER, Circuit Judges.
_____

RILEY, Chief Judge.

David Nguyen (David) admitted to a managerial role in his family's marijuana business, pled guilty to various drug-related crimes, and testified at the trial of his sister, Va Thi Nguyen (Va), and cousin-in-law, Phieu Nguyen (Phieu). A jury found Va and Phieu guilty, and the district court ordered Phieu to forfeit most of his assets. David appeals his 140 month sentence, Va appeals her conviction, and Phieu appeals his conviction and the forfeiture order. We dismiss David's appeal, affirm the

_____

[1]The Honorable William Jay Riley became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 1, 2010.

convictions of Va and Phieu, and affirm in part and reverse in part the district court's forfeiture order.

## I.    BACKGROUND
### A.    Facts

When viewed in the light most favorable to the jury's verdicts and accepting all reasonable inferences in support thereof, see, e.g., United States v. Bordeaux, 570 F.3d 1041, 1047 (8th Cir. 2009) (citation omitted), the facts are as follows:

### 1.    Nguyen Marijuana Business

No later than 2005, Phieu hatched a conspiracy to manufacture marijuana in Siouxland for sale throughout the United States. At its zenith, the conspiracy included seven "grow houses" and over 6,000 marijuana plants. Six of the grow houses were in Sioux City, Iowa, and the remaining grow house was located in South Sioux City, Nebraska.

Phieu recruited family members and others to help him grow, process, and sell marijuana. Phieu's co-conspirators included David, Va, Bao Quoc Nguyen (Bao), Khoi Van Ha (Khoi), Tru Quoc Nguyen (Tru), and Phong Duy Le (Phong). Phieu's co-conspirators helped him procure electricity for the grow houses,[2] buy supplies, tend marijuana plants, and dispose of waste. David arranged and oversaw all of Phieu's sales.

Phieu's marijuana conspiracy was very successful and generated hundreds of thousands of dollars in cash. Phieu was in charge of revenue, and he purchased expensive cars and a nice house with his share of the profits. Phieu orchestrated a variety of financial transactions to conceal his ill-gotten gains—purchasing money

---

[2]Phieu's co-conspirators dug holes in the foundations of some of the grow houses to bypass electrical meters and installed wiring, ballasts, lighting, and timers.

orders, funneling cash through his children's bank accounts, and breaking up his own deposits into individual amounts under $10,000 to evade federal reporting requirements.

### 2. Investigation

In 2006, Casey Tran, the owner of a garden supply business in Pennsylvania, informed the Drug Enforcement Administration (DEA) a man in Sioux City had placed a large order for equipment and supplies. The DEA contacted law enforcement officers in Sioux City, who began conducting surveillance of Phieu.

Soon thereafter, Tran drove a truck to Iowa and delivered the equipment and supplies to Ivy's Liquors, a business Phieu owned in Sioux City. Ivy's Liquors consisted of a liquor store, a convenience store, and a storage building.

Phieu drove his BMW to Ivy's Liquors shortly after Tran arrived. While Tran ate at a local restaurant, Phieu drove the truck to a grow house on Forest View in Sioux City. Phieu, Bao, and Phong unloaded the truck and drove it back to Ivy's Liquors. Phieu paid Tran $28,000 in cash, and Tran returned to Pennsylvania.

In February 2007, law enforcement officers conducted surveillance of a grow house on Thirteenth Street in Sioux City. The officers watched Va leave the house carrying a white sack and several empty milk cartons. Va drove to a grow house on West Second Street in Sioux City, carried the sack and milk cartons inside, and remained inside for over forty-five minutes.

A couple of weeks later, there was a water leak inside the West Second Street grow house. When the landlord's maintenance man tried to repair the pipe, he found the house filled with marijuana plants, growing equipment and supplies. The landlord called law enforcement, which executed a search warrant at the West Second Street

grow house. Officers found nearly 700 marijuana plants, grow lights on automatic timers, ballasts, and power panels in the West Second Street grow house. Reflective material covered the walls, and plywood shuttered the windows.

Instead of seizing the marijuana and associated materials, law enforcement officers staged a burglary. The officers did not know who was renting the house, because the renter had provided false information to the landlord. Soon thereafter, Bao arrived. He stayed less than a minute and rushed away. Several days later, several unknown persons moved everything from the West Second Street grow house, save the marijuana plants, in a white cargo van to the storage building at Ivy's Liquors.

In March 2007, officers executed a search warrant at the storage room. They also placed a tracking device on the white cargo van, which they determined Khoi owned. Using the tracking device, officers observed various persons use the van to transport equipment and supplies to the six remaining grow houses and waste to a landfill. (To harvest marijuana, the co-conspirators severed each plant at its stem, hung the plant's leaves to dry, and then threw away the plant's stem and roots). Officers recovered the remnants of approximately 3,500 harvested marijuana plants at the landfill.

In September 2007, officers executed search warrants at each of the seven grow houses. They found the houses filled with growing equipment, supplies, and more than 2,500 marijuana plants. They arrested many members of the conspiracy, including Va. Va was the sole occupant of the Thirteenth Street grow house, which—except for a bedroom—was filled with 467 marijuana plants. Officers also found fertilizer next to gallon jugs similar to those they saw Va transporting to the West Second Street grow house.

### B. Prior Proceedings

#### 1. Indictment

In January 2008, a grand jury returned a second superseding indictment against Phieu, David, Va, and four others. Count 1 charged Phieu and David with continuing criminal enterprise (CCE), in violation of 21 U.S.C. § 848(a) and (c). Count 2 charged Phieu, David, Va, and others with conspiracy, in violation of 21 U.S.C. § 846. Counts 5 through 8 charged Phieu with money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (B)(i), (B)(ii) and 2. Counts 9 and 10 charged Phieu with money laundering, in violation of 18 U.S.C. §§ 1957 and 2. Count 21 charged David with conspiracy to launder money, in violation of 18 U.S.C. § 1956(h). Pursuant to 21 U.S.C. § 853, the government sought to forfeit most of Phieu's assets, including $1.2 million, the BMW, and Phieu's home in Dakota Dunes, South Dakota.[3]

#### 2. Pleas, Trial, and Post-Trial Motions

In June 2008, David and the government entered into a plea agreement. David pled guilty to Counts 1 and 21 and agreed to testify against Va and Phieu. As a part of the plea agreement, he waived his right to appeal unless his sentence was, in relevant part, "unconstitutionally defective."

In August 2008, Phieu pled guilty to Count 2 without a plea agreement. After a seven-day trial, the jury found Va guilty of Count 2, and found Phieu guilty of Count 1 and Counts 5 through 10. The jury found $1.3 million of Phieu's savings, the BMW, and Phieu's home should be forfeited to the government, because these assets either facilitated or were derived from the proceeds of his marijuana conspiracy.

At the close of the government's case-in-chief and in a series of post-trial motions, Phieu and Va moved for judgments of acquittal and new trials, pursuant to

---

[3]The remaining counts are not relevant to these appeals.

Federal Rules of Criminal Procedure 29 and 33. With respect to forfeiture, Phieu also filed a motion for a directed verdict at the close of the government's case-in-chief, pursuant to Federal Rule of Civil Procedure 50. The district court denied each of these motions. Phieu then filed a motion to set aside the forfeiture, pursuant to Federal Rule of Civil Procedure 60(b), which the court granted in part and denied in part. The court reduced the monetary portion of the forfeiture from $1.3 million to $500,000, but declined to set aside the forfeiture of the BMW or the home.

### 3. Sentencing

In November 2008, the district court sentenced Va to 120 months imprisonment, Phieu to 240 months imprisonment,[4] and David to 140 months imprisonment. Only David's sentence is at issue in this appeal. The district court calculated David's advisory United States Sentencing Guidelines (Guidelines or U.S.S.G.) range to be 240 to 262 months imprisonment. The government moved for a downward departure and a sentence below the mandatory minimum of 240 months due to David's substantial assistance to the government, see U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e), and recommended a 15% reduction from the low end of David's Guidelines range.

The district court granted the government's § 5K1.1 and § 3553(e) motions. The court found David provided the government with "very significant but not extraordinary" substantial assistance. The court disagreed with the 15% recommendation, stating,

> I . . . think that when somebody testifies in a multi-defendant conspiracy trial that 15[%] is a very, very, very limited recommendation.

---

[4]The district court sentenced Phieu on Count 1 and Counts 5 through 10, and dismissed Count 2, pursuant to United States v. Jelinek, 57 F.3d 655, 660 (8th Cir. 1985).

. . . 15[%] I think is extremely low . . . . [I]n most of the districts in the country . . . [David] would have received a 50[%] or greater recommendation.

Having said that, I'm bound by Eighth Circuit law, not by what other districts do. And while it's my own professional judgment that our U.S. Attorney's Office['s] policies leads to substantial disparity compared to other districts in the circuit and outside the circuit, . . . I feel my hands are tied on that because I can only consider the [§] 5K1.1 factors. And I'm not allowed to consider under existing Eighth Circuit law the [§] 3553(a) factors[.] I am hopeful but not optimistic that the circuit will change that view in [United States v. Burns, 577 F.3d 887 (8th Cir. 2009) (en banc) (Burns II)]. . . . And I'm also optimistic but not hopeful that the Eighth Circuit's requirement that in order to do a 50[%] substantial assistance reduction the defendant's substantial assistance has to be extraordinary [will be overturned]. I think that [requirement] can be called into question after [Gall v. United States, 552 U.S. 38 (2007)], but so far the Eighth Circuit has not changed their view on that, and I'm bound by Eighth Circuit law whether I agree with it or not . . . . So I would easily go greater than 50[%] in this case if I were allowed to consider the [§] 3553(a) factors or if I could sentence a defendant whose substantial assistance was very significant but not extraordinary.

David appeals his sentence, Va appeals her conviction, and Phieu appeals his conviction and the forfeiture.

## II.    DISCUSSION
### A.    David's Appeal
#### 1.    Argument

David argues the district court erred when it held only "extraordinary" substantial assistance would justify an "extraordinary" downward departure of 50% or more under 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1. Over the government's objection, David maintains he did not waive his right to appeal this issue in his plea

agreement, because the district court's alleged misstatement of the law resulted in an "unconstitutionally defective" sentence.[5]

### 2.    Analysis

As a general rule, a defendant may waive his right to appeal in a plea agreement.  See United States v. Andis, 333 F.3d 886, 889 (8th Cir. 2003) (en banc). Before enforcing an appeal waiver, we undertake a three-part inquiry.  See United States v. Snelson, 555 F.3d 681, 685 (8th Cir. 2009).  We ensure (1) the defendant knowingly and voluntarily waived his right to appeal; (2) the issues the defendant wishes to appeal fall within the scope of the waiver; and (3) enforcement of the waiver would not result in a miscarriage of justice.  See id.  When conducting this inquiry, the government bears the burdens of proof and persuasion.  See United States v. Sisco, 576 F.3d 791, 795 (8th Cir. 2009).  Any ambiguities in a waiver must be construed against the government.  See id.

David does not contend he did not knowingly and voluntarily waive his right to appeal.  Nor does he assert in his opening brief that enforcement of the waiver would result in a miscarriage of justice.  David advances a miscarriage-of-justice argument in his reply brief, but by failing to raise this argument sooner, he waived it. See United States v. Gentry, 555 F.3d 659, 666 n.5 (8th Cir. 2009).  In any event, the error David alleges is not appealable under the miscarriage-of-justice exception.  See Andis, 333 F.3d at 891-92 (discussing the narrowness of the miscarriage-of-justice

---

[5]David also argues the district court erred when it held it lacked authority to reduce his sentence below the mandatory minimum sentence based on the factors, other than substantial assistance, set forth in 18 U.S.C. § 3553(a).  This argument is a non-starter.  While David's appeal was pending, the en banc court reinforced our previous holding that a district court, "after reducing a sentence based on . . . § 3553(e), . . . may not reduce the sentence further based on factors, other than assistance, set forth in . . . § 3553(a)."  Burns II, 577 F.3d at 894 (reaffirming United States v. Williams, 474 F.3d 1130 (8th Cir. 2007)).

exception and reiterating that an alleged misapplication of the Guidelines or an abuse of discretion at sentencing is not appealable); see also Sisco, 576 F.3d at 796 (stating that "[a]ny sentence imposed within the statutory range is not subject to appeal" under the miscarriage-of-justice exception).[6]

The fighting point is whether the issue David attempts to appeal falls within the scope of his waiver. David's plea agreement with the government permits him to appeal an "unconstitutionally defective" sentence. David maintains his sentence is unconstitutionally defective because the district court's alleged error—holding only "extraordinary" substantial assistance would justify an "extraordinary" downward departure of 50% or more under 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1—contravened his Sixth Amendment rights.[7] We disagree.

The heart of David's argument is the district court violated his Sixth Amendment right to trial by jury when, apparently anticipating proportionality review on appeal, the district court concluded it lacked authority to reduce David's sentence further than it did under U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e). In other words, the district court erroneously self-constrained the exercise of its discretion and considered itself to be tethered too tightly to the Guidelines in holding only

_____

[6]Andis left open the possibility that a sentence could be appealable under the miscarriage-of-justice exception if the sentence were "based on some constitutionally impermissible factor," Andis, 333 F.3d at 894, because the sentence would "not be authorized by law," id. at 892. Because we conclude David's alleged error is procedural not constitutional, see infra, he would not be able to appeal under any such Andis exception.

[7]David also claims the district court's alleged error violated his Fifth Amendment right to due process of law. It appears David invites us to hold—as a matter of first impression—that any procedural error at a criminal defendant's sentencing violates such defendant's due process rights. We decline to so hold and, in essence, wrap the entirety of federal sentencing in constitutional garb.

-10-

"extraordinary" substantial assistance would justify an "extraordinary" downward departure of 50% or more under 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1.

For present purposes, we assume without deciding David's sentence is "defective" in light of the district court's statement that only "extraordinary" substantial assistance would justify an "extraordinary" downward departure of 50% or more under 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1. While David's appeal was pending, the en banc court in Burns II extended Gall's proscriptions against "notions of exceptional/extraordinary circumstances, departure percentages, proportionality review, and similar data-based standards of review" to appellate review of § 3553(e) and § 5K1.1 substantial assistance motions. Burns II, 577 F.3d at 896.[8] The en banc court saw

> no basis upon which to say that the [Supreme] Court's admonitions [in Gall] regarding the highly deferential view that appellate courts should take towards a district court's appraisal of the § 3553(a) factors should not also apply to the district court's findings and determinations regarding the five § 5K1.1 factors as it calculates the substantiality of the defendant's assistance when ruling on the government's motion for a reduction under § 3553(e).

---

[8]Before Burns II, we applied garden-variety abuse of discretion review to § 3553(e) and § 5K1.1 substantial assistance motions, requiring some proportionality between the extent of the downward departure and the nature of the defendant's substantial assistance. In Gall, the Supreme Court held our post-Booker, pre-Gall rule in the § 3553(a) context "requiring 'proportional' justifications for departures from the Guidelines range [was] not consistent with [the Court's] remedial opinion in [Booker]." Gall, 552 U.S. at 46. The Supreme Court observed we had "engaged in an analysis that more closely resembled *de novo* review of the facts presented," id. at 56, and held that, "while the extent of the difference between a particular sentence and the recommended Guidelines range is surely relevant, courts of appeals must review all sentences . . . under a deferential abuse-of-discretion standard," id. at 41.

<u>Id.</u> at 895.

Even if <u>Burns II</u> retroactively rendered David's sentence "defective,"[9] David's sentence is not "***unconstitutionally*** defective." At most, the district court committed procedural error when it held that only "extraordinary" substantial assistance would justify an "extraordinary" downward departure of 50% or more under 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1. An examination of the theoretical underpinnings of <u>Burns II</u> and its antecedent Supreme Court decisions is necessary to explain why we reach this conclusion.

As indicated, <u>Burns II</u> extended <u>Gall</u>'s deferential abuse of discretion standard of review to appeals of rulings on § 3553(e) and § 5K1.1 substantial assistance motions. We believe the en banc court's extension of "<u>Gall</u> appellate review" to appeals of rulings on § 3553(e) substantial assistance motions was not grounded upon the Sixth Amendment. Two facets of the en banc majority's decision support our conclusion.

First, the en banc majority in <u>Burns II</u> did not purport to ground its decision in the Sixth Amendment. The majority conspicuously did not attempt to tie its

---

[9]A defective sentence is not necessarily a reversible sentence. And we note, after <u>Burns II</u>, different panels of this court have reached varying conclusions as to whether similar statements by the same district court judge amounted to reversible error. <u>Compare United States v. Brunken</u>, 581 F.3d 635, 637-38 (8th Cir. 2009) (declining to follow <u>United States v. Bates</u>, 343 F. App'x 173, 174-75 (8th Cir. 2009) (unpublished per curiam)), <u>with</u> <u>United States v. Jensen</u>, 586 F.3d 620, 622-24 & n.3 (8th Cir. 2009). These panel decisions appear to sit on the fault lines of much of the recent sentencing debate. <u>See</u> <u>Burns II</u>, 577 F.3d at 895 n.5 (quoting <u>United States v. Lee</u>, 553 F.3d 598, 602 (8th Cir. 2009)) (questioning "'whether the standard articulated in this court's pre-<u>Gall</u> proportionality review was substantively different from the Supreme Court's direction to district courts in <u>Gall</u> that 'a major departure should be supported by a more significant justification than a minor one'").

conclusion into the Sixth Amendment sentencing jurisprudence most notably advanced in United States v. Booker, 543 U.S. 220 (2005). Indeed, Booker only held "[a]ny fact (other than a prior conviction) which is necessary to support a sentence *exceeding* the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." Booker, 543 U.S. at 244 (emphasis added). A district court's ruling on a substantial-assistance motion should create no constitutional concerns under the Sixth Amendment, as elucidated in Booker, because the only possible effect of a § 3553(e) or § 5K1.1 motion is to reduce a defendant's sentence.

Second, the Burns II majority did not quarrel with the primary thrust of Judge Colloton's dissent in that case. Relying on the limited scope of Booker's holding, Judge Colloton reasoned the Sixth Amendment did not require the majority's decision to extend "Gall appellate review" to appeals of rulings on § 3553(e) motions. See Burns II, 577 F.3d at 903 (Colloton, J., dissenting) ("The district court's ruling on a substantial-assistance motion under § 3553(e) . . . poses no constitutional concerns under the Sixth Amendment. The only possible effect of a § 3553(e) motion is to reduce the defendant's sentence. . . . [T]here is no potential that judicial factfinding conducted in resolving a § 3553(e) motion will increase the statutory maximum punishment. Accordingly, there is no constitutional difficulty with an appellate rule that requires a district court to identify justifications for a sentence reduction under § 3553(e) that are proportional to the magnitude of the reduction." (internal citations omitted)). The Burns II majority's failure to engage Judge Colloton's main argument is some evidence the majority did not base its decision on the Sixth Amendment. Cf. Lamb Eng'g & Constr. Co. v. Neb. Public Power Dist., 103 F.3d 1422, 1436 (8th Cir. 1997) ("We find support for our holding today implicitly in the language of the . . . majority opinion and explicitly in the dissenting opinions.").[10]

_____

[10]The majority also did not abrogate our line of cases indicating that, so long as a defendant such as David admits the facts that form the basis of his sentence, the

If Burns II was not grounded in the Sixth Amendment, then what was its legal foundation?  In our view, Burns II extended Gall's deferential abuse of discretion standard of review to appeals of rulings on substantial assistance motions as a procedural matter, in light of the practicalities of appellate review.  In arriving at its conclusion, the Burns II majority repeatedly stressed the institutional advantages of the district court in sentencing criminal defendants.  In relevant part, the majority wrote:

> The Court in Gall noted the district court's superior position to find and judge the impact of facts under § 3553(a), the district court's opportunity to see and hear the evidence and thus make credibility determinations, and the district court's greater access to and familiarity with the individual case and the individual defendant.  The court also noted the district court's "institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guidelines sentences than appellate courts do."  [Gall], at 598 (quoting Koon v. United States, 518 U.S. 81, 98 (1996)).

> * * *

> The institutional advantage that the [Supreme] Court spoke of in Koon and Gall applies with equal force in a § 3553(e) case. We appellate judges can claim no knowledge superior to that of the district court in

---

Sixth Amendment is not implicated.  See, e.g., United States v. Henson, 550 F.3d 739, 741 (8th Cir. 2008) ("Henson admitted all facts necessary to the calculation of his advisory guideline range, so the district court's treatment of the range as presumptively reasonable is undoubtedly a non-constitutional error." (internal citation omitted)), cert. denied, 129 S. Ct. 2736 (2009); United States v. Frojker, 415 F.3d 865, 875 (8th Cir. 2005) (similar).  We note, however, the defendant in Gall admitted the facts forming the basis of his sentence.  See Gall, 552 U.S. at 64 (Alito, J., dissenting) ("[T]he rules set out in the [majority] opinion . . . have nothing to do with juries or factfinding and, indeed, . . . not one of the facts that bears on petitioner's sentence is disputed.").

-14-

making the evaluations and findings required by § 5K1.1. Accordingly, our review of the significance and usefulness of a defendant's assistance should accord the district court's assessment of that assistance the institutional deference it deserves.

Burns II, 577 F.3d at 894-95 (certain citations omitted). Only the district court judge, with "boots on the ground," looks into the defendant's eyes before imposing sentence—appellate judges reviewing a cold transcript and presentence investigation report are "Johnny-come-latelies" who should afford the district court due deference.

The Burns II majority's reliance on Gall, in itself, should not be understood as implicit reliance upon the Sixth Amendment. While Gall is certainly part of the Supreme Court's Apprendi[11]-line of Sixth Amendment sentencing jurisprudence, the Burns II majority relied on Gall in a manner untethered from Gall's Sixth Amendment foundations. For the Burns II majority, Gall was instructive for its discussion of the non-constitutional question of *what abuse of discretion review means* in this post-Booker world. Gall reinvigorated the Booker remedy by stressing the inherent institutional advantages of the district courts over the circuit courts of appeals in determining appropriate sentences for criminal defendants. We do not construe Gall to hold implicitly that the Sixth Amendment requires deferential review of all of the district court's sentencing decisions. See Gall, 552 U.S. at 64 (Alito, J., dissenting) ("[T]he rules set out in the [majority] opinion . . . have nothing to do with juries or factfinding . . . . What is at issue . . . is the allocation of the authority to decide issues of substantive sentencing policy, an issue on which the Sixth Amendment says absolutely nothing.").

---

[11]Apprendi v. New Jersey, 530 U.S. 466 (2000).

-15-

For the foregoing reasons, we hold David's sentence is not "unconstitutionally defective" and thus falls within the scope of his appeal waiver.[12] We enforce the waiver and dismiss David's appeal. See, e.g., Sisco, 576 F.3d at 798 (dismissing appeal).

### B.     Va's Appeal
#### 1.     Argument
Va argues the district court erred when it denied her Rule 29 motion for a judgment of acquittal. The district court reserved ruling on the motion at the close of the government's case-in-chief, but denied it after trial. Va maintains the government failed to present sufficient evidence to show she knowingly participated in a marijuana conspiracy. At most, she asserts, the government proved she was present at the scene of a conspiracy and was acquainted with criminals.

#### 2.     Analysis
Although we review the district court's denial of a motion for judgment of acquittal de novo, United States v. Rush-Richardson, 574 F.3d 906, 909 (8th Cir. 2009), the underlying standard of review is highly deferential to the jury's verdict. We "reverse only if no reasonable jury could have found [Va] guilty beyond a reasonable doubt." United States v. Morales, 445 F.3d 1081, 1084 (8th Cir. 2006) (quoting United States v. Howard, 413 F.3d 861, 864 (8th Cir. 2005)). We "view the evidence in the light most favorable to the guilty verdict, granting all reasonable inferences that are supported by that evidence." United States v. Milk, 447 F.3d 593, 598 (8th Cir. 2006). "The standard for reviewing a claim of insufficient evidence is

---

[12]We do not purport to limit or expand Burns II's holding to extend "Gall appellate review" to appeals of rulings on  § 3553(e) and § 5K1.1 motions.   The "unconstitutionally defective" language of David's plea agreement required us only to determine whether Burns II was grounded in the Sixth Amendment.

strict, and a jury's guilty verdict should not be overturned lightly." United States v. Pizano, 421 F.3d 707, 719 (8th Cir. 2005).

Va concedes her "eventual trial testimony may have created a largely unreviewable credibility question for the jury"[13] but insists our "review of the sufficiency of the evidence [must] be limited to that presented at the time the government closed its case-in-chief and the district court reserved ruling on [her] motion for judgment of acquittal." This is a correct statement of the law. See Fed. R. Crim. P. 29 advisory committee's note to 1994 Amends. ("[T]he amendment provides that the trial court is to consider only the evidence submitted at the time of the motion in making the ruling, whenever made. And in reviewing a trial court's ruling, the appellate court would be similarly limited."); see, e.g., United States v. Moore, 504 F.3d 1345, 1347 (11th Cir. 2007) (limiting appellate review to the evidence the government presented in its case-in-chief); United States v. Truong, 425 F.3d 1282, 1288 (10th Cir. 2005) (same).

Conspiracy has three elements. By the conclusion of its case-in-chief,

> the government had the burden to prove three essential elements beyond a reasonable doubt to convict [Va] of conspiracy to manufacture marijuana: (1) two or more persons reached an agreement or came to an understanding to commit against the United States the criminal offense of knowingly and intentionally manufacturing marijuana; (2) [Va] individually, voluntarily, and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect; [and] (3) at the time [Va] joined in the agreement or understanding, [s]he knew the purpose of the agreement or understanding.

---

[13]The government effectively impeached Va during her cross-examination. A reasonable jury could find Va repeatedly perjured herself at trial.

United States v. Scott, 64 F.3d 377, 380 (8th Cir. 1995).

Va concedes the government presented sufficient evidence to prove the first element of conspiracy, i.e., the existence of an agreement between Phieu and others to manufacture marijuana. However, Va argues the government failed to present sufficient evidence to prove the second and third elements insofar as they required the government to prove she knowingly joined such conspiracy. Va asserts the government's paucity of evidence forced the jury to speculate on this key factual issue. She maintains it is equally likely that, as she argued to the jury, she thought she was merely helping others grow "medicines" for hospitals. Va maintains she is a meek Vietnamese woman who—as is common in her culture—did not ask any questions of her male co-conspirators.

There is ample evidence in the government's case-in-chief to support Va's conviction. At the outset, it is important to remember "[a] conviction may be based on circumstantial as well as direct evidence. The evidence need not exclude every reasonable hypothesis except guilt." United States v. Erdman, 953 F.2d 387, 389 (8th Cir. 1992) (citation omitted). Here, sufficient circumstantial evidence—as well as common sense—connects Va to Phieu's marijuana conspiracy.

Va lived in the Thirteenth Street grow house with 467 marijuana plants. She was the sole occupant of the house. She was paid thousands of dollars each month simply to "house sit" the plants, as well as 691 marijuana plants in the West Second Street grow house. Both grow houses were starkly furnished and had undergone extensive modification. Notably, the windows of the houses were boarded up even during the Iowa summer. If the growing of the plants inside the houses were legal, as Va maintains, it would make little sense to board up the windows given the extensive measures to provide the plants with indoor lighting. The secrecy alone was a clue to illegality.

Va was acquainted with Phieu, David, Khoi, Tru, and Phong. She was related to Phieu and David, and Khoi was her ex-boyfriend. All of these men were members of the marijuana conspiracy. When law enforcement officers questioned Va, she lied and tried to hide Phieu's true identity. David testified that, before Va moved to Sioux City, he warned her against becoming involved with the illegal drug trade. When David discovered Va moved to Sioux City, he expressed anger toward her, fearing Va would be arrested and leave her child without a mother.

The jury was permitted to use its common sense to infer Va knew what she was doing. For example, the jury could have inferred Va knew the windows were boarded up to shield illegal activity from the public. David's warning to Va and expressed anger at Va's participation manifest Va's knowing involvement. At the very least, the jury was entitled to convict Va believing she "could have lacked knowledge only by deliberately turning a blind eye." United States v. Aleman, 548 F.3d 1158, 1166 (8th Cir. 2008), cert. denied sub. nom. Martinez-Menera v. United States, 129 S. Ct. 2756 (2009); see also United States v. Chavez-Alvarez, 594 F.3d 1062, 1067 (8th Cir. 2010) ("The concept of willful blindness is a limited exception to the requirement of actual knowledge, and the jury may find willful blindness only if the defendant was aware of facts that put him on notice that criminal activity was afoot and deliberately failed to make further inquiries, intending to remain ignorant."). We affirm Va's conviction.

## C.    Phieu's Appeal
### 1.    Conspiracy as a Predicate Offense for CCE

Phieu argues the district court erred when it instructed the jury that conspiracy may constitute a predicate offense for CCE. The government maintains the district court's instruction correctly states the law.

Section 848(a) makes it a crime to "engage[] in a continuing criminal enterprise." 21 U.S.C. § 848(a). Section 848(c) defines "[c]ontinuing criminal enterprise" as follows:

[A] person is engaged in a continuing criminal enterprise if—

(1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and

(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter—

(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

(B) from which such person obtains substantial income or resources.

To prove Phieu guilty of CCE, the government was required to prove five elements: (1) a felony violation of the federal narcotics laws; (2) as part of a continuing series of three or more related felony violations of federal narcotics laws; (3) in concert with five or more other persons; (4) whom Phieu organized, managed, or supervised; and (5) from which he derived substantial income or other resources. See United States v. Jackson, 345 F.3d 638, 645 (8th Cir. 2003).

The district court instructed the jury that conspiracy is "a felony violation of the federal narcotics laws" for purposes of the first and second elements listed in Jackson. The district court's instruction was correct. While heretofore an open issue in this circuit, United States v. Scott, 218 F.3d 835, 839 (8th Cir. 2000), nearly every circuit court of appeals has held conspiracy qualifies as a predicate to CCE. See, e.g., United

-20-

States v. Harris, 959 F.2d 246, 254 (D.C. Cir. 1992), abrogated on other grounds by United States v. Stewart, 246 F.3d 728 (D.C. Cir. 2001); United States v. Hicks, 945 F.2d 107, 108-09 (5th Cir. 1991) (per curiam); United States v. Hernandez-Escarsega, 886 F.2d 1560, 1571 (9th Cir. 1989); United States v. Hall, 843 F.2d 408, 410-11 (10th Cir. 1988); United States v. Fernandez, 822 F.2d 382, 384-85 (3d Cir. 1987); United States v. Ricks, 802 F.2d 731, 737 (4th Cir. 1986) (en banc); United States v. Schuster, 769 F.2d 337, 345 (6th Cir. 1985); United States v. Young, 745 F.2d 733, 751-52 (2d Cir. 1984); United States v. Brantley, 733 F.2d 1429, 1436 n.14 (11th Cir. 1984); United States v. Middleton, 673 F.2d 31, 33 (1st Cir. 1982); cf. United States v. Baker, 905 F.2d 1100, 1103-05 (7th Cir. 1990) (defining "series" to include only two offenses, none of which may be conspiracy, which "brings [the Seventh Circuit] into harmony in result, although not in exposition, with the seven other circuits that set a minimum of three violations and allow the included conspiracy to serve as one"). The majority of these courts adhere to the plain and unambiguous language of § 848(c), which states any felony violation of the federal narcotics laws is an eligible predicate offense. See 21 U.S.C. § 848(c)(1) (including "any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony").[14]

### 2. Alternate Theories of Money Laundering

Phieu argues the district court abused its discretion when it "issu[ed] the jury instructions with all of the money laundering statutes as options." In each of Counts 5 through 8 of the indictment, the government alleged Phieu committed three distinct species of money laundering: conducting a financial transaction (1) with the intent to

---

[14]We do not adopt the Seventh Circuit's reasoning, because we have already defined "series" in § 848(c) as three predicate offenses. Jackson, 345 F.3d at 645. We reject Phieu's argument that using conspiracy as a predicate for CCE violates the Double Jeopardy Clause. The Double Jeopardy Clause only prohibits punishment for both CCE and conspiracy because conspiracy is a lesser included offense of CCE. See United States v. Jelinek, 57 F.3d 655, 660 (8th Cir. 1995).

promote the carrying on of unlawful activity (promotion), 18 U.S.C. § 1956(a)(1)(A)(i); (2) knowing the transaction was designed in whole or in part to conceal or disguise the proceeds of an unlawful activity (concealment), id. §1956(a)(1)(B)(i); and (3) to avoid a transaction reporting requirement (avoidance), id. §1956(a)(1)(B)(ii).

The district court did not abuse its discretion in submitting all of the government's alternate theories of money laundering to the jury. "A count may allege that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means." Fed. R. Crim. P. 7(c). Therefore, "where a 'statute specifies two or more ways in which one offense may be committed, all may be alleged in the conjunctive in one count of the indictment, and proof of any one of the methods will sustain a conviction.'" United States v. Roy, 408 F.3d 484, 492 n.4 (8th Cir. 2005) (quoting Gerberding v. United States, 471 F.2d 55, 59 (8th Cir. 1973)). Far from forbidding the instructions the district court used in this case, we have encouraged them. See id. ("direct[ing] the government in future cases" to charge in the alternative to "adequately inform the defendant of each allegation that he must defend against while solving any potential multiplicity problems"). It appears Phieu's real complaint is the district court submitted all three theories of money laundering as to each count when some of those theories lacked evidentiary support. So long as there is sufficient evidence in the record to support at least one of the alternate theories for each count of conviction, however, the judgment and sentence against Phieu must stand. See, e.g., United States v. Wantland, 135 F. App'x 893, 896 (8th Cir. 2005) (per curiam) (quoting Turner v. United States, 396 U.S. 398, 420 (1970)).

-22-

### 3.     Motions for Acquittal
#### a.     Count 1

Phieu contends the district court erred when it denied his motion for acquittal as to Count 1, the CCE count. Specifically, Phieu posits the government did not present sufficient evidence in its case-in-chief from which a reasonable jury could find he managed, organized, or supervised five or more persons in a marijuana conspiracy.

We construe the "management element" of CCE "liberally" and with "plain meaning." United States v. Possick, 849 F.2d 332, 335 (8th Cir. 1988).

> A defendant need not be the "king pin" or ultimate authority in the organization, but need only occupy some managerial position, or perform a "central role." The government need not establish that the defendant managed five people at once, that the five acted in concert with each other, that the defendant exercised the same kind of control over each of the five, or even that the defendant had personal contact with each of the five. In essence, the management element is established by demonstrating that the defendant exerted some type of influence over another individual as exemplified by that individual's compliance with the defendant's directions, instructions, or terms.

Id. at 335-36 (citations omitted).

The jury found Phieu organized, managed, or supervised Va, Bao, Tru, Khoi, and Phong (but not David). Giving the jury's verdict the deference it deserves, there is sufficient evidence in the record to sustain the jury's findings. Although Phieu's co-conspirators offered competing descriptions of the conspiracy's hierarchy at trial, the jury apparently believed Phieu was one of the conspiracy's managers. This factual finding is supported in the record. Phieu's co-conspirators variously testified Phieu recruited persons to the conspiracy, claimed a large share of the fruits of the crime, handled the proceeds and oversaw the distribution of profits, ordered and paid for

marijuana, supplies and equipment, organized the removal of waste, showed others how to grow marijuana, and otherwise directed his co-conspirators' activities. The jury's credibility determinations are "virtually unassailable on appeal," United States v. Vickers, 528 F.3d 1116, 1120 (8th Cir. 2008) (quoting United States v. Alama, 486 F.3d 1062, 1065 (8th Cir. 2007)), and the trial evidence all tends to show Phieu organized, managed, or supervised Va, Bao, Tru, Khoi, and Phong. See, e.g., United States v. Rockelman, 49 F.3d 418, 420-21 (8th Cir. 1995) (supervising drug couriers indicative of managerial role); United States v. Johnson, 28 F.3d 1487, 1500 (8th Cir. 1994) (recruiting co-conspirators, supplying drugs, leasing a crack house, and collecting cash from drug sales indicative of managerial role); United States v. Mitchell, 49 F.3d 769, 772-73 (D.C. Cir. 1995) (recruiting co-conspirators indicative of managerial role). It is irrelevant that David pled guilty to CCE, because a single CCE or conspiracy may have multiple managers. See United States v. Atencio, 435 F.3d 1222, 1234 (10th Cir. 2006).

Phieu's argument that the testimony of Khoi, Bao, and Tru is so incredible that it must be discarded is not well-taken. "While it may have been possible for a rational jury to have disbelieved" many of the government's witnesses and acquitted Phieu of Count 1, governing precedent "does not demand that the government's evidence be so conclusive and unimpeachable that no reasonable person could have rejected it." United States v. Watson, 952 F.2d 982, 989 (8th Cir. 1991) (citation omitted). What is prohibited is "reliance on evidence so untrustworthy that no rational person could have believed it." Id. Such is not the case here, and we affirm Phieu's conviction as to Count 1.

### b.     Counts 5-8

Phieu maintains the district court erred in denying his motion for acquittal with respect to his convictions on Counts 5 through 8 for money laundering. Phieu's argument necessarily fails as to Counts 5, 6, and 8. On each of these three counts, the

jury convicted Phieu of alternate theories of money laundering and Phieu does not dispute the sufficiency of the evidence as to all alternate theories. Specifically, Phieu does not contest the jury's findings regarding the promotion alternative for Count 5 or the avoidance alternatives for Counts 6 and 8. Accordingly, we affirm his convictions as to those counts. See Wantland, 135 F. App'x at 896 (affirming conviction because there was sufficient evidence to support at least one alternate theory of the government's case).

With respect to Count 7, there is sufficient evidence from which a reasonable jury could find the concealment alternative of money laundering was proven. Count 7 charged Phieu with using two large cash deposits totaling $10,000 on March 30, 2007, to conceal proceeds of the marijuana conspiracy. At trial, the government presented evidence showing Phieu gave his son, John, $10,000 in cash and ordered him to deposit the cash in John's bank account. Phieu also told John to lie about the source of the cash if he were ever questioned about it, and Phieu instructed John to state that he stole the cash. John was a known drug user and thief. On March 30, 2007, John deposited Phieu's cash in John's bank accounts—one $3,000 deposit and one $7,000 deposit. On April 16, 2007, John wrote his father a check for $10,220.00. A reasonable jury could find Phieu was putting cash into John's account to hide its true source. See United States v. Shoff, 151 F.3d 889, 892 (8th Cir. 1998) (stating a "common type of money laundering is the transfer of unlawful proceeds into an account in another person's name"). There is no paper record of the initial transaction between Phieu and John, and nothing in John's deposits to the bank or other contemporaneous conduct identified Phieu as the source of the funds. To the casual observer it appears John was simply depositing his own cash into his bank account and then later making a gift to his father. Cf. United States v. Sanders, 929 F.2d 1466, 1472-73 (10th Cir. 1991) (holding there was insufficient evidence of concealment, because, even though the defendant purchased vehicles in her daughter's name, the defendant conspicuously used the cars in such a manner as to "mak[e] the association

of these vehicles with the [defendant] obvious to law enforcement"), abrogated on other grounds by Salinas v. United States, 522 U.S. 52 (1997). A reasonable jury could infer the cash represented the proceeds of Phieu's marijuana conspiracy, because Phieu earned considerable cash income from such conspiracy, and Ivy's Liquors, his only legitimate source of cash income, was failing.

### 4. Motions for New Trial

Phieu avers the district court abused its discretion when it denied his motions for new trial as to Counts 1 and 5 through 8. Phieu maintains his convictions constitute a "miscarriage of justice" because there was insufficient evidence to support them.

A district court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. The district court's discretion in this regard is "quite broad," United States v. Campos, 306 F.3d 577, 579 (8th Cir. 2002), and we review only for an abuse of such discretion, United States v. Peters, 462 F.3d 953, 957 (8th Cir. 2006). In light of the considerable evidence supporting the jury's guilty verdicts, as set forth above, it is evident the district court did not abuse its discretion in determining no miscarriage of justice occurred in this case.

### 5. Forfeiture

Phieu argues the district court erred when it ordered Phieu to forfeit his BMW, home, and $500,000. An asset is subject to forfeiture only if the government proves by a preponderance of the evidence such asset is "property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of [a drug crime]" (proceeds prong) or was "used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation" (facilitation prong). 21 U.S.C. § 853; see United States v. Bieri, 21 F.3d 819, 822 (8th Cir. 1994) (applying preponderance of the evidence standard). We "review . . . factual findings for clear

error but apply a de novo standard of review to [the issue] of whether or not those facts render the [asset] subject to forfeiture." United States v. Dodge Caravan Grand SE/Sport Van, 387 F.3d 758, 761 (8th Cir. 2004).

### a.     BMW

At trial, the government argued the BMW facilitated Counts 1 and 2 of the indictment because (1) Phieu drove the BMW to Ivy's Liquors to meet Tran; (2) Phieu used the BMW to transport Tran to a restaurant; and (3) law enforcement officers spotted the BMW at several of Phieu's grow houses. The record only supports the first of these three propositions. The jury found the BMW was subject to forfeiture under the facilitation prong, and the district court declined to set aside the jury's finding.

The government now concedes the district court erred, because there is not "a sufficient facilitation nexus between the BMW and the CCE." The government nonetheless argues we may affirm because:

> When the government proves it is entitled to forfeiture, but the specific property is no longer available, 21 U.S.C. § 853(p) directs that the district court shall order the forfeiture of substitute assets. United States v. Hatcher, 323 F.3d 666, 673 (8th Cir. 2003). Pursuant to the money judgment entered by the district court in it's [sic] final order of forfeiture, the BMW was properly forfeited as a substitute asset.

The government's argument is puzzling. The district court did not order the forfeiture of the BMW as a substitute asset and, therefore, made no finding that the $500,000 money judgment against Phieu was unavailable. See, e.g., 21 U.S.C. § 853(p)(1) (requiring proof of one of five categories of unavailability). Even if we were to deem the BMW a substitute asset for an unavailable money judgment, we would need to reduce the amount due under the money judgment by the BMW's fair

market value. We have no way to know the BMW's fair market value and, in the interest of finality, we decline to give the government two bites at the forfeiture apple. See, e.g., United States v. Gammage, 580 F.3d 777, 779 (8th Cir. 2009) (seeing "'no reason why the government should get a second bite at the apple'" at sentencing when "[t]here were no arcane legal principles involved" and the district court did not err or mislead the government) (quoting United States v. Leonzo, 50 F.3d 1086, 1088 (D.C. Cir. 1995)). We vacate the district court's forfeiture of the BMW.

### b.     House and $500,000

The district court correctly held there was sufficient evidence to support the jury's findings that Phieu's house facilitated the marijuana conspiracy and Phieu earned at least $500,000 from the conspiracy. With respect to the house, there was sufficient evidence in the record from which a reasonable jury could find there was "something more than an incidental or fortuitous contact between the property and the underlying illegal activity." United States v. Lewis, 987 F.2d 1349, 1356 (8th Cir. 1993) (quoting United States v. 3639-2nd Street, N.E., 869 F.2d 1093, 1096 (8th Cir. 1989)). Various witnesses testified co-conspirators brought the cash proceeds of the conspiracy to Phieu's house, where it was counted and divided up. Phieu also stored ledgers of drug transactions and how-to-grow-marijuana manuals in his home. See, e.g., United States v. Real Prop. in Section 9, 308 F. Supp. 2d 791, 807 (E.D. Mich. 2004) (holding forfeiture of real property was appropriate in part because the defendant's "ledger book, which [the defendant] used to facilitate his drug trafficking" was found there). With respect to the $500,000, Phieu may be held jointly and severally liable for all of the foreseeable proceeds of the conspiracy. See United States v. Simmons, 154 F.3d 765, 769-70 (8th Cir. 1998) (holding co-defendants in a RICO enterprise, "in accord with the traditional rules with respect to criminal conspiracies," were jointly and severally liable for forfeiture). The jury was not required to credit Phieu's self-serving testimony that he only earned between $50,000

and $60,000 from his illegal activity and spent it all on vehicles whose forfeiture he did not contest in the district court.

## III.   CONCLUSION

We dismiss David's appeal and affirm the convictions of Va and Phieu.  We affirm in part and reverse in part the district court's order of forfeiture.  The district court's forfeiture order of Phieu's BMW is vacated.

_____