# United States Court of Appeals
## For the Eighth Circuit

_____

No. 11-3487

_____

United States of America

*Plaintiff - Appellee*

v.

Nicole Walker

*Defendant - Appellant*

_____

No. 11-3489

_____

United States of America

*Plaintiff - Appellee*

v.

Bart Hyde

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Southern District of Iowa - Davenport

_____

Submitted: April 18, 2012
Filed: August 9, 2012

_____

Before RILEY, Chief Judge, MURPHY and MELLOY, Circuit Judges.

_____

RILEY, Chief Judge.

Nicole Walker and Bart Hyde each pled guilty to conspiring to manufacture and distribute methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1). Walker and Hyde appeal their respective sentences, arguing the district court[1] clearly erred in calculating the drug quantity attributable to each of them. Hyde also argues the district court erred in imposing an obstruction of justice enhancement and failing to reduce Hyde's sentence for acceptance of responsibility. We affirm.

## I.    BACKGROUND

In 2004, police officers in Clinton, Iowa, received information from multiple sources that Walker and Hyde were involved in manufacturing and distributing methamphetamine in Clinton. The officers' investigation confirmed Walker and Hyde were responsible for distributing large amounts of anhydrous methamphetamine and what coconspirators described as "ice"[2] methamphetamine.

_____

[1]The Honorable James E. Gritzner, Chief Judge, United States District Court for the Southern District of Iowa.

[2]"Ice" is a purer, more potent form of methamphetamine. Section 2D1.1(c), n.(C) of the advisory United States Sentencing Guidelines (U.S.S.G. or Guidelines) defines "ice" as "a mixture or substance containing d-methamphetamine hydrochloride of at least 80% purity." The United States Sentencing Commission amended the Guidelines in 1991 to include provisions for "ice" in response to congressional instructions to ensure convictions for offenses involving smokable crystal methamphetamine under 21 U.S.C. § 841(b) would be assigned an offense level "two levels above that which would have been assigned to the same offense

-2-

Walker and Hyde were arrested. On August 18, 2010, a grand jury charged Walker and Hyde with conspiring to manufacture and distribute methamphetamine from 2003 to 2008, in violation of 21 U.S.C. §§ 846, 841(a)(1), and (b)(1)(A). Both Walker and Hyde pled guilty.

Before sentencing, the United States Probation Office prepared presentence investigation reports (PSRs) recommending the district court attribute to Walker and Hyde 1,222.9 grams of methamphetamine mixture, three grams of actual methamphetamine, and 1,087.6 grams of "ice" methamphetamine—a total of 24,257.8 kilograms of marijuana equivalency.[3] Walker and Hyde each objected to references to "ice" methamphetamine in their respective PSRs and to the total drug quantity attributed to them.

The district court conducted a joint sentencing hearing over the course of three days. In its sentencing memorandum, the government argued the total drug quantity attributable to the conspiracy was "at least 724 grams of a mixture and substance containing methamphetamine, 142.5 grams of actual methamphetamine, and 182 grams of '[i]ce' methamphetamine," which resulted in a total marijuana equivalency of 7,938 kilograms of marijuana and a base offense level of 34.

---

involving other forms of methamphetamine." See Pub. L. No. 101–647, 104 Stat. 4789, § 2701 (Nov. 29, 1990); U.S.S.G. app. C, amend. 369 (1991).

[3]To calculate the advisory offense level in cases involving several different controlled substances, controlled substances other than marijuana are converted into "marijuana equivalents" and then added together "to obtain a single offense level." See U.S.S.G. § 2D1.1, cmt. n.10 (explaining the use of the drug equivalency tables). One gram of methamphetamine mixture is equivalent to two kilograms of marijuana, whereas one gram of methamphetamine (actual) and one gram of "ice" are each equivalent to twenty kilograms of marijuana. U.S.S.G. § 2D1.1, cmt. n.10(E).

During the hearing, twelve witnesses testified, including lead investigator Sergeant Ronald Hereen, Hyde, and several coconspirators. Walker did not testify but made a proffer statement in which she admitted distributing methamphetamine and "ice" methamphetamine more than fifty times. Walker disclaimed any knowledge of the purity of the "ice" she distributed.

The government's witnesses testified in detail to a large number of drug transactions involving Walker and Hyde. Witnesses described Walker's home as a center of drug activity that included assembling precursors, distributing methamphetamine, and hanging out and getting high.

Testimony from the coconspirators described a large illegal drug operation, with several individuals, including Hyde and Joe Burridge, reselling methamphetamine Walker supplied. Burridge asserted Walker and Hyde both dealt in large quantities of methamphetamine. Burridge testified he purchased a total of 300 to 400 grams of methamphetamine from Walker. Another coconspirator recalled seeing "a lot of" methamphetamine, maybe weighing an estimated 100 to 200 grams, on a plate at Walker's home. Many other witnesses testified to frequent purchases of smaller amounts.

In 2005, Hyde identified an Arizona source for "ice" and began distributing "ice" methamphetamine. Hyde arranged to receive packages of "ice" from Arizona on several occasions and traveled there at least twice to obtain the drug. Burridge estimated he received varying amounts of "ice" from Hyde approximately ten times from the fall of 2005 to the winter of 2006.

Several other witnesses testified they obtained "ice" from Hyde. Walker and Hyde's coconspirators described the "ice" as purer, more potent with a "cleaner high," better burning, and of higher quality than the anhydrous methamphetamine manufactured in Iowa. The witnesses who obtained "ice" from Walker and Hyde

were unaware of the Guidelines definition of "ice" and denied knowing the precise purity of the drugs they purchased.

Burridge testified Walker and Hyde worked together to transport the "ice" from Arizona and distribute it in Clinton. At the hearing, Hyde acknowledged obtaining methamphetamine from Arizona and distributing it in Clinton, but denied any drug involvement with Walker beyond smoking methamphetamine with her. Hyde denied even knowing Burridge.

Hyde also admitted the methamphetamine he obtained from Arizona was "crystal meth," which the government explained is another term for "ice." But Hyde, like Walker, could not say how pure the drugs were. Law enforcement officers never intercepted any of the drugs Hyde received from Arizona. Only a small amount of methamphetamine was ever seized from Walker's home during the investigation and no one tested the drug for purity.

At the close of the sentencing hearing, the district court decided "in the process of reviewing . . . all of the evidence, the court must conclude that the evidence supports the determination that the total quantity in this case was 7,938 kilograms of marijuana equivalent." The district court acknowledged "some reservation about the precision of that amount," but noted the amount "is more than twice [the 3,000 kilograms of marijuana equivalency] necessary in order for this case to come in at a level 34." In assigning that base-offense level to both Walker and Hyde, the district court stated it was "confident on the record in this case that the lower amount of 3,000 is surpassed."

The district court also found (1) the Arizona methamphetamine Hyde distributed was "ice," and (2) Hyde intentionally gave false testimony with respect to the drug quantity involved in the conspiracy and Hyde's knowledge of Burridge. Because Hyde was not truthful, the district court assessed a two-level enhancement

for obstruction of justice and refused to make a downward adjustment for acceptance of responsibility.

On November 7, 2011, the district court sentenced Walker to 120 months imprisonment (level 31, category I) and sentenced Hyde to 235 months imprisonment (level 36, category III). Walker and Hyde appeal their sentences.

## II.    DISCUSSION
### A.    Drug Quantity

Walker and Hyde contend the district court erred in calculating the drug quantity attributable to each of them under the advisory Guidelines. "We review the district court's application of the sentencing guidelines de novo." United States v. Miller, 511 F.3d 821, 823 (8th Cir. 2008). The district court's drug quantity and identity determinations are factual findings, which we review "for clear error, applying the preponderance-of-the-evidence standard." United States v. Turner, 603 F.3d 468, 471 (8th Cir. 2010); see also United States v. Maxwell, 25 F.3d 1389, 1397 (8th Cir. 1994). The district court's "factual determinations will stand 'unless the decision is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire record, we are left with a firm and definite conviction that a mistake has been made.'" Miller, 511 F.3d at 823 (quoting United States v. Rodriguez-Hernandez, 353 F.3d 632, 635 (8th Cir. 2003)).

### 1.    Scope of the Conspiracy

Walker and Hyde argue the district court relied on unreliable evidence and applied an overly broad definition of conspiracy. Specifically, Walker and Hyde deny being involved in the same conspiracy and challenge Burridge's testimony regarding the relationship between Walker and Hyde and the quantities of drugs Burridge bought from them. Walker's and Hyde's arguments are unavailing.

"The elements of a drug conspiracy are that two or more persons reached an agreement to distribute or possess with intent to distribute a controlled substance, that the defendant voluntarily and intentionally joined the agreement, and that at the time that he joined the agreement, he knew its essential purpose." United States v. Harris, 493 F.3d 928, 931 (8th Cir. 2007). "[T]o be guilty of a single conspiracy, the conspirators need not know each other or be privy to the details of each enterprise comprising the conspiracy as long as the evidence is sufficient to show that each defendant possessed full knowledge of the conspiracy's general purpose and scope." United States v. Huggans, 650 F.3d 1210, 1222 (8th Cir. 2011) (quoting United States v. Prieskorn, 658 F.2d 631, 634 (8th Cir. 1981)) (internal quotation marks omitted).

"In a drug conspiracy case, the district court may consider amounts from drug transactions in which the defendant was not directly involved if those dealings were part of the same course of conduct or scheme." United States v. Bradley, 643 F.3d 1121, 1126 (8th Cir. 2011) (quoting United States v. Rodriguez, 484 F.3d 1006, 1014 (8th Cir. 2007)) (internal quotation marks omitted); see also U.S.S.G. § 1B1.3(a)(2). "[T]he sentencing court may consider all transactions known or reasonably foreseeable to the defendant that were made in furtherance of the conspiracy." United States v. Payton, 636 F.3d 1027, 1046 (8th Cir. 2011) (quoting United States v. Plancarte-Vazquez, 450 F.3d 848, 852 (8th Cir. 2006)) (internal quotation marks omitted); see also U.S.S.G. § 1B1.3(a)(1).

> When the amount of drug seized by the government does not reflect the scale of the drug trafficking offense, as in this case, "the court shall approximate the quantity of the controlled substance" for sentencing purposes. U.S.S.G. § 2D1.1, comment. (n.12). "The court may make a specific numeric determination of quantity based on imprecise evidence." United States v. Roach, 164 F.3d 403, 413 (8th Cir. 1998). It "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a).

United States v. Sicaros-Quintero, 557 F.3d 579, 582 (8th Cir. 2009). "A sentencing court may determine drug quantity based on the testimony of a co-conspirator alone." United States v. Sarabia-Martinez, 276 F.3d 447, 450 (8th Cir. 2002).

Walker's and Hyde's written plea agreements and the testimony of Walker and Hyde's coconspirators support the district court's drug quantity determination in this case. Though Walker and Hyde deny any connection between each other's admitted methamphetamine distribution activities, Walker and Hyde each pled guilty to conspiring with some of the same people to distribute methamphetamine in Clinton. Evidence "that many of the same people [were] involved with each other and sought to achieve the same objectives" supports finding a single conspiracy. United States v. Mosby, 177 F.3d 1067, 1071 (8th Cir. 1999).

The evidence the government adduced at the sentencing hearing identified Walker and Hyde as key figures in a rather large conspiracy to distribute methamphetamine. Walker and Hyde's coconspirators testified Walker and Hyde distributed methamphetamine together, used drugs together at Walker's home—a hub of illegal drug activity, and both obtained "ice" from Arizona to distribute in Clinton. Burridge testified Walker and Hyde both dealt in large quantities of methamphetamine and conspired together to distribute methamphetamine.

Walker and Hyde take issue with the reliability of the government's witnesses in general and question Burridge's credibility in particular, noting he had a motive to lie to obtain a reduced sentence. But "[a]rguments about the reliability of a witness are in reality an attack on the credibility of that testimony, and witness credibility is an issue for the sentencing judge that is virtually unreviewable on appeal." Sarabia-Martinez, 276 F.3d at 450. The district court did not clearly err in finding Walker and Hyde were part of a single conspiracy and estimating the quantity of

methamphetamine attributable to each of them based on their coconspirators' testimony.

Walker and Hyde also assert the district court's drug quantity calculation improperly included amounts resulting from simple buyer/seller relationships, see Prieskorn, 658 F.2d at 634, and quantities held for personal use, see United States v. Fraser, 243 F.3d 473, 475-76 (8th Cir. 2001). These arguments are without merit.

Walker pled guilty to conspiracy to distribute methamphetamine and admitted distributing methamphetamine or "ice" to different buyers more than fifty times for a total of at least 200 grams. "Prieskorn applies when there is evidence that only a single, isolated sale of drugs occurred," not when a defendant pleads guilty to multiple transactions and distributing large quantities of methamphetamine over an extended period of time. United States v. Montano-Gudino, 309 F.3d 501, 505-06 (8th Cir. 2002).

As for Hyde's personal-use argument, "[i]n conspiracy-to-distribute cases we have held that drug quantities purchased for personal use by a member of the conspiracy are relevant in determining the total drug quantity attributable to the defendant under U.S.S.G. § 2D1.1." Fraser, 243 F.3d at 474. Hyde's attempt to distinguish Fraser based upon his dubious assertion "[h]is conduct or common scheme or plan was predominantly not to distribute those drugs" is unpersuasive.

### 2. "Ice" Methamphetamine

Walker and Hyde contend the district court clearly erred in attributing "ice" methamphetamine to them because, in their view, the record evidence of purity was insufficient and unreliable to conclude the drugs met the Guidelines definition of "ice." Hyde frames the issue two ways: (1) "whether the [district court] should have found that there was 'ice' methamphetamine as defined under the Guidelines when there is no evidence as to the manufacturer of this drug nor any measured sample

indicating purity level," and (2) "whether testimony or statements of users (the lay population) who have no chemical background or knowledge of the [Guidelines] and who use the slang term 'ice' in describing methamphetamine is sufficient to warrant the [district court's] finding that there is 'ice' methamphetamine as defined by the [Guidelines]." According to Hyde, "we have no basis to conclude by a preponderance of evidence that [Hyde] had methamphetamine that had a purity level of 80%" because there were "no lab reports to indicate a purity factor," and there was "no evidence as to the manufacturing process." We disagree.

Although the Guidelines do not specify what evidence is required to establish methamphetamine as "ice" and we have not previously addressed the precise issues raised in this appeal, we have consistently rejected arguments demanding direct evidence of drug identity, quantity, or purity. See, e.g., United States v. Whitehead, 487 F.3d 1068, 1071-72 (8th Cir. 2007) (rejecting defendant's argument the government failed to prove the identity of a controlled substance through chemical testing and reminding "that the identity . . . can be proved by circumstantial evidence and opinion testimony" (quoting United States v. Covington, 133 F.3d 639, 644 (8th Cir. 1998)) (internal marks omitted)). We have long held such requirements are contrary to the flexible Guidelines approach of allowing the sentencing court broad discretion to consider a wide range of relevant evidence from a variety of sources as long as the evidence "has sufficient indicia of reliability to support its probable accuracy." Sicaros-Quintero, 557 F.3d at 582 (quoting U.S.S.G. § 6A1.3(a)); see also U.S.S.G. § 2D1.1, cmt. n.12; United States v. Newton, 31 F.3d 611, 614 (8th Cir. 1994) (rejecting an argument "the exact purity level of the unrecovered [methamphetamine was] impermissibly uncertain" because "the guidelines do not require an exact computation of the drug quantity").

The Guidelines do not require the government to establish the identity, quantity, or purity of methamphetamine by laboratory analysis. See United States v. Koonce, 884 F.2d 349, 352-53 (8th Cir. 1989); United States v. Garcia-Panama, 432

F. App'x 641, 642-43 (8th Cir. 2011) (unpublished per curiam) (explaining the government need not "conduct a purity calculation on all of the methamphetamine distributed during the course of the conspiracy" to establish drug identity or quantity under § 2D1.1). Nor do the Guidelines "require absolute certainty about the amount of drugs or their purity when the drugs are not seized or the amount seized does not reflect the scale of the offense." United States v. Cockerill, No. 99-4634, 2000 WL 852608, at *2-3 (4th Cir. June 28, 2000) (unpublished per curiam) (determining the sentencing court did not clearly err in attributing pure methamphetamine to the defendant based upon the testimony of a coconspirator that the unseized methamphetamine "was of very good quality"), cited with approval in United States v. Houston, 338 F.3d 876, 879 (8th Cir. 2003); accord United States v. Long, 532 F.3d 791, 796 (8th Cir. 2008) (calculating the total quantity of actual (pure) methamphetamine attributable to the defendant by extrapolating the percentage of purity of a tested quantity to the unrecovered quantities).

A sentencing court may "determine drug quantity using imprecise evidence, so long as the record reflects a basis for the court's decision." Bradley, 643 F.3d at 1126-27 (quoting United States v. Zierke, 618 F.3d 755, 761 (8th Cir. 2010)) (internal quotation marks omitted). When no illegal drugs have been recovered, "the government may prove" the identity of such drugs or "the purity of quantities [of such drugs] attributed to the defendant," Houston, 338 F.3d at 879, "by circumstantial evidence and opinion testimony," Covington, 133 F.3d at 644 (quoting United States v. Williams, 982 F.2d 1209, 1212 (8th Cir. 1992) (accepting the testimony of an experienced narcotics detective as to the identity of drugs as sufficient evidence to support the jury verdict)) (internal marks omitted). Such evidence may include "a conspirator's reliable testimony that purchased methamphetamine was 'undiluted, unadulterated . . . not cut . . . pure,' or an expert's testimony as to the normal purity of methamphetamine produced in a lab." Houston, 338 F.3d at 879 (quoting Cockerill, 2000 WL 852608, at *1) (internal quotation marks and citations omitted).

-11-

The specificity of the Guidelines definition of "ice"—requiring 80% purity—does not fundamentally change the means by which the government may meet its burden of proving drug quantity. See id. In evaluating whether methamphetamine is "ice" as defined in the Guidelines, the sentencing court may consider, among other things, the source of the controlled substance, see id., "the price generally obtained for the controlled substance," U.S.S.G. § 2D1.1, cmt. n.12, the substance's appearance and form, and reports of the identity and quality of the substance from its users and distributors, see United States v. Brown, 156 F.3d 813, 816 (8th Cir. 1998). "The verdict of the marketplace is strong confirmation" of the identity and quality of an illegal drug because the users and distributors "who regularly smoke it or sell it" are "among the most knowledgeable experts on" such drugs. Id.; see also United States v. Hyatt, 207 F.3d 1036, 1038 (8th Cir. 2000) (affirming a sentencing court's drug identity determination based in part on the "co-conspirators' belief that the drug they were distributing was methamphetamine").

Applying this legal framework, we are not persuaded the district court clearly erred in determining Walker and Hyde distributed "ice" as defined in the Guidelines. Walker, Hyde, and their coconspirators consistently identified the methamphetamine from Arizona as "ice" or "crystal meth." Walker and Hyde's coconspirators distinguished the "ice" methamphetamine Hyde obtained from Arizona from the anhydrous methamphetamine manufactured in Iowa based on its appearance, form, price, and quality.

One user described the "ice" as being "[l]ike little pieces of glass, little chunks of glass." Another described the "ice" as a "cleaner dope" that looked like "slices of glass" as opposed to anhydrous methamphetamine which was in powder or rock form. Burridge testified the "shards" of "ice" he bought looked "totally different" and cost more than anhydrous methamphetamine manufactured in Iowa. Burridge further testified the "ice" he obtained from Walker resulted in a "cleaner high" that would allow the user to "stay up longer without feeling side effects." Several other users

-12-

described the "ice" as better, purer, more potent, burning better, and of higher quality than the anhydrous methamphetamine available in Clinton.

The circumstances of the conspiracy corroborate the testimony of Walker and Hyde's coconspirators. Sergeant Hereen identified Arizona as a common source for "ice" and explained the differences between "ice" methamphetamine from Arizona, manufactured in Mexico, and anhydrous methamphetamine, manufactured in Iowa. Sergeant Hereen indicated "ice" from clandestine labs in Mexico is cleaner, higher purity, more potent and produces a "more intense high." Based upon the Arizona origin of the drugs and the descriptions of Walker and Hyde's coconspirators, Sergeant Hereen opined the methamphetamine Hyde obtained from Arizona was "ice." There is nothing in the record to indicate Hyde or his source in Arizona cut or diluted the Arizona "ice" before distributing it in Clinton.

Hyde faults the district court for crediting the testimony of his coconspirators because they did not have chemistry backgrounds or understand the definition of "ice" under the Guidelines. Hyde suggests a more stringent standard than the advisory Guidelines require. That Walker, Hyde, and their coconspirators did not have a scientific or technical understanding of the term "ice" is relevant to the district court's assessment of the reliability of their testimony as to drug identity or purity, but does not necessarily preclude the district court from finding the methamphetamine from Arizona was "ice." On this record, we cannot say the district court clearly erred in attributing "ice" to Walker and Hyde.[4]

---

[4]This is not to diminish the value of chemical testing when reasonably practicable, particularly given the increased penalties for "ice" methamphetamine and the relatively high purity level specified in the advisory Guidelines definition. Scientific testing of at least part of a quantity of suspected "ice" methamphetamine seized from a conspiracy is one of the strongest means by which the government can meet its burden of proving the methamphetamine attributed to a defendant is "ice" as defined in the Guidelines. See United States v. Verdin-Garcia, 516 F.3d 884, 896

-13-

## C.      Obstruction of Justice

Hyde contends the district court erred in applying an obstruction of justice enhancement based upon the district court's determination that Hyde intentionally gave false testimony.  "A defendant is subject to an enhancement under U.S.S.G. § 3C1.1 if he testifies falsely under oath in regard to a material matter and does so willfully rather than out of confusion or mistake." United States v. Mabie, 663 F.3d 322, 334 (8th Cir. 2011) (quoting United States v. Mendoza-Gonzalez, 363 F.3d 788, 796 (8th Cir. 2004)) (internal quotation marks omitted); accord U.S.S.G. § 3C1.1 cmt. n.4(B), (F).

"We give great deference to a district court's decision to impose an obstruction of justice enhancement, reversing only when the district court's findings are insufficient." United States v. Yarrington, 634 F.3d 440, 452 (8th Cir. 2011) (quoting United States v. Cunningham, 593 F.3d 726, 730 (8th Cir. 2010)) (internal quotation marks omitted).  "A district court must find the predicate facts supporting such an enhancement for obstruction of justice by a preponderance of the evidence." United States v. Alvarado, 615 F.3d 916, 922 (8th Cir. 2010).

Before Hyde testified, the district court cautioned Hyde that providing intentionally false or misleading testimony could constitute obstruction of justice and lead to a longer sentence.  In evaluating Hyde's testimony, the district court found Hyde intentionally gave false testimony concerning the drug quantity involved in the conspiracy and Hyde's knowledge of Burridge.

---

(10th Cir. 2008) (explaining "[l]aboratory test results are perhaps more persuasive evidence of amounts and purities than eyewitness testimony or wiretapped conversations").  We also agree with the Third Circuit's observation that "where a written plea agreement is entered[,] questions of notice and proof at sentencing could be greatly minimized by simply including language in the plea agreement by which a defendant acknowledges the identity of the drugs involved." United States v. Roman, 121 F.3d 136, 141 n.4 (3d Cir. 1997).

-14-

Hyde's challenge to the district court's findings is largely based on his unsuccessful challenge to Burridge's credibility. Hyde argues (1) "[t]here is nothing in this record to indicate [Hyde's testimony that conflicts with the testimony of Burridge] is not the truth" and (2) there is "no basis . . . to conclude" Hyde testified untruthfully about the quantities involved. Hyde's arguments are without merit. The district court's findings that Hyde intentionally gave false testimony are supported by the record. "Lying to obtain a lighter sentence is obstruction of justice under U.S.S.G. § 3C1.1, and the district court's finding that [Hyde] lied 'must be accepted unless clearly erroneous.'" United States v. Moore, 624 F.3d 875, 878 (8th Cir. 2010) (quoting United States v. Flores, 959 F.2d 83, 87 (8th Cir. 1992)). The district court did not clearly err.

### D.    Acceptance of Responsibility

We also reject Hyde's assertion the district court erred in denying Hyde a reduction for acceptance of responsibility. See U.S.S.G. § 3E1.1 (explaining a sentencing court should reduce a defendant's base offense level by two levels "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense"). "A district court's factual determination about whether the defendant accepted responsibility is entitled to great deference, and we will reverse it only if it is so clearly erroneous as to be without foundation." United States v. Smith, 665 F.3d 951, 957 (8th Cir. 2011) (quoting United States v. Wallenfang, 568 F.3d 649, 661 (8th Cir. 2009)) (internal quotation marks omitted).

"Where a defendant has obstructed justice, it is the extraordinary case where a defendant may receive an adjustment for acceptance of responsibility." United States v. Jones, 612 F.3d 1040, 1047 (8th Cir. 2010) (citing U.S.S.G. § 3E1.1, cmt. n.4). Such "extraordinary cases" are "extremely rare and highly exceptional." Smith, 665 F.3d at 957 (quoting United States v. Honken, 184 F.3d 961, 970 (8th Cir. 1999)) (internal marks omitted). This is not such a case. We affirm the district court's denial of a reduction for acceptance of responsibility.

## III.  CONCLUSION

We affirm the sentences the district court imposed on Walker and Hyde.

_____