# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-3386

_____

United States of America

*Plaintiff - Appellee*

v.

Kurt Alexander

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Cedar Rapids

_____

Submitted: April 10, 2013
Filed: May 16, 2013

_____

Before WOLLMAN, BEAM, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Kurt Alexander was convicted of one count of conspiring to distribute and possess with intent to distribute methamphetamine and three counts of distributing methamphetamine. The district court[1] sentenced him to 324 months imprisonment

_____

[1]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

and ordered entry of a personal money judgment in the amount of $47,009. Alexander appeals his conviction on the conspiracy count, his sentence, and the money judgment. We affirm in all respects.

I.

While investigating drug trafficking in Cedar Rapids, law enforcement officers received information that Kurt Alexander and Timothy Otis were working together to distribute methamphetamine in the area. They arranged a controlled buy from Otis on September 20, 2011. Under surveillance a confidential informant went to Otis' house with $600 to purchase a quarter ounce of methamphetamine. Otis asked the informant to wait while he went "[t]o Kurt's house," drove to Alexander's residence where they met in the garage, and then returned with a baggy of methamphetamine for the informant. Testing revealed that the baggy contained 5.7 grams of 73.3% pure methamphetamine. Six days later officers executed simultaneous search warrants at the residences of Alexander and Otis. In Alexander's garage they found 1.8 grams of 79.1% pure methamphetamine, $3,800 in cash, a digital scale, baggies with twist ties commonly used to package narcotics, and other drug paraphernalia. They however failed to discover at that time two other pounds of methamphetamine which were hidden on his property.

Even after the searches, Alexander and Otis continued selling methamphetamine. Law enforcement executed further controlled buys on November 10 and December 7. Each followed the same basic sequence. The confidential informant went to Otis' house, Otis drove to Alexander's garage to pick up the methamphetamine, and Otis returned to his house to sell the drugs to the informant. The second buy involved 6.3 grams of methamphetamine and the third 5.4 grams; each amount of methamphetamine was 48.8% pure. Officers tried to arrange two more controlled buys from Otis the following month, but each attempt failed for Alexander was not available.

Alexander and Otis were arrested in February 2012. After Otis agreed to plead guilty and cooperate with the government, Alexander was charged in a superseding indictment. Count one charged Alexander with conspiracy to distribute and possess with intent to distribute at least 500 grams of methamphetamine mixture and at least 50 grams of pure methamphetamine within 1,000 feet of a playground, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846, and 860. Counts two through four were based on the three controlled buys and charged Alexander with the distribution of methamphetamine within 1,000 feet of a playground, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 860. The government also sought a $50,000 money judgment against Alexander based on his drug trafficking proceeds.

At trial Otis testified that he first received methamphetamine from Alexander in 2008 and soon began buying personal use quantities from him about three times each week. Otis resold small amounts of his methamphetamine, but he would "go right to Kurt" if others wanted larger quantities. Otis' distribution had increased by 2010 when Alexander was supplying him two or three times a week with half ounce quantities of methamphetamine at a price of $1,000 per half ounce. In late 2010 after Otis was released from jail on a different charge, Alexander deposited about $80,000 for him in a bank. Over time Alexander subtracted from that total to account for Otis' drug debt, keeping a ledger to log the transactions. As Otis became more involved in Alexander's operations, he learned that Alexander typically bought pound quantities of methamphetamine from a source in DeWitt, Iowa for $28,000 per pound. In late summer 2011, Otis arranged a transaction in which Alexander sold a third party one ounce of methamphetamine for a number of firearms. Otis described the firearms as "numerous shotguns and one Japanese 7-millimeter with a bayonet, antique gun." Otis and Alexander continued distributing methamphetamine until their arrest.

Law enforcement officers testified about their investigation of Alexander's drug trafficking operations, and the government introduced evidence of the three

controlled buys and items seized from Alexander's residence. The confidential informant and eight other individuals testified about buying methamphetamine from Alexander and Otis, describing the quantities and prices of drugs they purchased. These customers explained that Otis often served as the middle man between buyers and Alexander. The jury convicted Alexander on all charges.

Alexander's presentence investigation report (PSR) recommended a total offense level of 38. It started with an offense level of 32 based on Alexander's responsibility for less than 1.5 kilograms of methamphetamine, then added two levels for drug sales near a protected location; two levels for being an organizer, leader, manager, or supervisor of criminal activity; and two levels for possessing a dangerous weapon in connection with drug sales. Alexander objected to all of these recommendations except for the protected location enhancement. The government objected to the PSR's drug quantity calculation, arguing that the trial evidence supported a finding substantially higher than 1.5 kilograms of methamphetamine.

The district court agreed with the government's argument on drug quantity, finding that Alexander was responsible for between 1.5 and 5 kilograms of methamphetamine mixture, which led to an offense level of 34. The district court also found that Alexander was an organizer, leader, manager, or supervisor of criminal activity and that he had possessed a dangerous weapon in connection with his offenses. Ultimately Alexander's total offense level of 40 and criminal history category II resulted in a guideline range of 324 to 405 months. The district court sentenced him to 324 months imprisonment and ordered a personal money judgment of $47,009. That amount was made up of the $50,000 the government sought in the superseding indictment minus the $2,991 seized on Alexander's arrest. Alexander now appeals his conviction on the conspiracy charge, his sentence, and the money judgment.

## II.

Alexander first challenges the jury's decision that he conspired to distribute and possess with intent to distribute methamphetamine. He argues that the evidence was insufficient to convict him on this count. We review the sufficiency of evidence de novo and will affirm the jury's verdict "if, taking all facts in the light most favorable to the verdict, a reasonable juror could have found the defendant guilty of the charged conduct beyond a reasonable doubt." United States v. Clark, 668 F.3d 568, 572 (8th Cir. 2012) (citation omitted). We do not weigh the evidence or witness credibility because the jury has "the sole responsibility to resolve conflicts or contradictions in testimony." United States v. Wiest, 596 F.3d 906, 910 (8th Cir. 2010). The jury's credibility determinations "are virtually unreviewable on appeal." Id. at 911.

To convict Alexander of the conspiracy charge in the superseding indictment, the government had to prove that (1) he and one or more persons reached an agreement to distribute or possess with intent to distribute methamphetamine, (2) he voluntarily and intentionally joined the agreement, (3) he understood the essential purpose of the agreement at that time, and (4) the conspiracy involved at least 500 grams of methamphetamine mixture and 50 grams of pure methamphetamine. See 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846; United States v. Walker, 688 F.3d 416, 421 (8th Cir. 2012).

Alexander argues that the government did not prove he reached an agreement to distribute methamphetamine with Otis or anyone else. He asserts that the trial evidence showed nothing more than buyer seller relationships which are insufficient to establish a conspiracy. We disagree. A true individual buyer seller case involves evidence of only "a single transient sales agreement and small amounts of drugs consistent with personal use." United States v. Huggans, 650 F.3d 1210, 1222 (8th Cir. 2011) (citation omitted). In contrast, the purchase of wholesale drug quantities

on numerous occasions "raises an inference of knowledge of a drug distribution venture that goes beyond an isolated buyer-seller transaction." Id.

In this case the government presented evidence of multiple transactions between Alexander and Otis involving wholesale quantities of methamphetamine. The three controlled buys that law enforcement executed in late 2011 establish more than a buyer seller relationship between Alexander and Otis. Moreover, Otis and a number of other witnesses testified about Alexander's extensive methamphetamine trafficking. Alexander attacks the character of many of these people, but credibility issues are for the jury. See Wiest, 596 F.3d at 910–11. We conclude that there was sufficient evidence for a reasonable jury to find that Alexander was party to an agreement to distribute methamphetamine.

Alexander next contends there was insufficient evidence that the conspiracy involved 50 grams of pure methamphetamine, emphasizing that law enforcement seized only about 11 grams of pure methamphetamine. In determining whether Alexander's conspiracy involved the requisite drug quantity, the jury was not limited to the amount directly seized. See United States v. Jones, 559 F.3d 831, 835–36 (8th Cir. 2009). The jury could properly consider witness testimony and other corroborating evidence to extrapolate from the amount and purity of narcotics actually seized. See id. (discussing United States v. Buckley, 525 F.3d 629, 631–33 (8th Cir. 2008); United States v. Velazquez, 410 F.3d 1011, 1013–16 (8th Cir. 2005)). The government presented evidence of the quantities and purity levels of methamphetamine seized during the three controlled buys and the search of Alexander's residence, as well as voluminous witness testimony about the quantities and prices of narcotics that Alexander trafficked. The jury was entitled to consider all of this evidence in reaching its drug quantity finding. See id. Viewing the facts in a light most favorable to the verdict, a reasonable jury could determine that Alexander's conspiracy involved at least 50 grams of pure methamphetamine.

## III.

We now turn to Alexander's sentence. Here, we must first ensure that the district court committed no significant procedural error. United States v. Dengler, 695 F.3d 736, 739 (8th Cir. 2012). We review findings of fact for clear error and the district court's application of the guidelines to those facts de novo. Id.

Alexander first argues that the district court erred in finding that he was responsible for between 1.5 and 5 kilograms of methamphetamine mixture. That finding resulted in an offense level of 34 under U.S.S.G. § 2D1.1(c)(3). Alexander highlights the uncertainties and variations in witness estimates of how much methamphetamine he sold, and he argues that certain quantities were improperly double counted. In making its drug quantity findings, the sentencing court may consider the amount of drugs directly seized, all transactions known or reasonably foreseeable by the defendant, witness testimony, and any other relevant information bearing sufficient indicia of reliability to support its probable accuracy. See Walker, 688 F.3d at 421 (citations omitted).

On this record the district court did not clearly err in its drug quantity findings. Witness testimony established that Alexander regularly possessed pound quantities of methamphetamine. One pound of methamphetamine mixture is the equivalent of approximately 450 grams, and Otis' testimony provided support for finding 1.5 kilograms of methamphetamine. As the district court noted, finding Alexander responsible for between 1.5 and 5 kilograms of methamphetamine was probably "conservative" based on all the trial evidence. We are satisfied that the district court did not clearly err.

Alexander next challenges his two level enhancement under U.S.S.G. § 3B1.1(c) for being "an organizer, leader, manager, or supervisor in any criminal activity." We "broadly construe" the definition of an organizer, leader, manager, or

supervisor. United States v. Brown, 539 F.3d 835, 838 (8th Cir. 2008). Under application note 4 to this guideline, we consider such factors as "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1 cmt. n.4.

We conclude that the district court did not clearly err in finding that Alexander qualified for this enhancement. Law enforcement officers could successfully arrange controlled buys from Otis only when Alexander was available to supply the drugs. After Otis was released from a brief time in jail, Alexander deposited about $80,000 for him in a bank. Alexander received pound quantities of methamphetamine from his source in DeWitt and redistributed the narcotics in Cedar Rapids. At Alexander's residence officers found a digital scale, baggies with twist ties, and other drug paraphernalia commonly used to distribute methamphetamine. These facts supports a finding that Alexander was an "organizer, leader, manager, or supervisor" of criminal activity. The district court did not err in this regard.

Alexander further asserts that the district court erred in imposing an enhancement for possession of a dangerous weapon. The guidelines provide for a two level enhancement if "a dangerous weapon (including a firearm) was possessed." U.S.S.G. § 2D1.1(b)(1). This enhancement "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." Id. cmt. n.11(A). Otis testified that he arranged a transaction in late summer 2011 in which Alexander sold an ounce of methamphetamine in exchange for a number of firearms. Our precedent is clear that the "trade of a firearm for drugs warrants" this enhancement. United States v. Martinez, 557 F.3d 597, 600 (8th Cir. 2009). While Alexander claims that Otis' testimony was unreliable, the district court determined that the enhancement was appropriate based on all the evidence. After

reviewing the record, we conclude the district court did not clearly err in finding that Alexander traded methamphetamine for firearms and properly applied this enhancement.

Alexander also claims that his 324 month sentence was substantively unreasonable. We review the reasonableness of a sentence for abuse of discretion, applying a presumption of reasonableness where, as here, the defendant was sentenced within his guideline range. Dengler, 695 F.3d at 740. Alexander argues that he should have been sentenced below his guideline range because of his age, limited criminal history, family circumstances, and need for drug treatment. He also contends that his 324 month sentence is disproportionate when compared to the 52 months Otis received. The district court considered each of these arguments in the context of all the 18 U.S.C. § 3553(a) sentencing factors. It explained that Alexander did not deserve a below guideline sentence because of the large quantities of methamphetamine involved, the duration of his trafficking operations, the serious nature of his offenses within 1,000 feet of a playground, and his criminal history. We conclude that the district court did not abuse its discretion in sentencing Alexander to 324 months, the bottom of his guideline range.

We finally consider the personal money judgment against Alexander. We review findings of fact for clear error and whether those facts render a particular asset subject to forfeiture de novo. United States v. Van Nguyen, 602 F.3d 886, 903 (8th Cir. 2010). An asset is subject to forfeiture if it "is 'property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of [a drug crime]' (proceeds prong) or was 'used, or intended to be used, in any manner or part, to commit or to facilitate the commission of, such violation' (facilitation prong)." Id. (citing 21 U.S.C. § 853) (alteration in original). In this case, the district court ordered a personal money judgment in the amount of $47,009. In the superseding indictment the government sought $50,000, but $2,991 in cash had been seized at the time Alexander was arrested and later deducted from the amount due.

According to Alexander, there was insufficient evidence to support the money judgment because it could only have been based on Otis' unreliable testimony.  This argument lacks merit.  Not only did the district court find Otis credible, but many other witnesses testified about the quantities and prices of methamphetamine that Alexander was trafficking.  The government also presented other evidence to corroborate the extensive witness testimony. Given the totality of evidence regarding the quantities and prices of drugs sold, the frequency of sales, and the length of the conspiracy, the district court did not err in finding that Alexander's drug trafficking involved at least $50,000 in proceeds.  The money judgment should be upheld.

IV.

Accordingly, we affirm Alexander's convictions, sentence, and money judgment.

_____