# United States Court of Appeals
### For the Eighth Circuit

_____

No. 20-2487
_____

United States of America

*Plaintiff - Appellee*

v.

Paul Gensley

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Cedar Rapids

_____

Submitted: April 16, 2021
Filed: June 25, 2021
[Unpublished]

_____

Before LOKEN, WOLLMAN, and STRAS, Circuit Judges.

_____

PER CURIAM.

Paul Gensley pleaded guilty to conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. The district court[1] found that $4,300 in cash discovered in Gensley's garage rafters was subject to forfeiture as proceeds of a drug crime, see 21 U.S.C. § 853, and sentenced Gensley to 151 months' imprisonment. Gensley appeals, arguing that the district court erred in ordering forfeiture, in determining his base offense level under the advisory U.S. Sentencing Guidelines (U.S.S.G. or Guidelines), and in declining to vary downward. We affirm.

For an asset to be subject to forfeiture as proceeds of a drug crime, the government must prove by a preponderance of the evidence that it is "property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of [a drug crime]." 21 U.S.C. § 853(a)(1); United States v. Bieri, 21 F.3d 819, 822 (8th Cir. 1994) (standard of proof). Gensley argues that because of its relatively small amount and because he offered a legitimate explanation—car repairs and other side jobs—for possessing it, the district court erred in finding that the cash was proceeds of a drug crime.

We conclude that the district court did not clearly err in finding that the $4,300 in cash was proceeds from a drug crime. United States v. Alexander, 714 F.3d 1085, 1092 (8th Cir. 2013) ("We review findings of fact for clear error and whether those facts render a particular asset subject to forfeiture de novo."). Gensley admitted that he was part of an ongoing drug conspiracy between August 2017 and August 2018. The cash was found hidden on a vintage metal tray in Gensley's garage rafters in April 2018. Along with the cash, the hidden tray held more than 100 gem bags; drug paraphernalia, including methamphetamine and marijuana pipes; and pieces of a notepad that appeared to be a ledger bearing handwritten first names or initials next

---

[1]The Honorable C.J. Williams, United States District Judge for the Northern District of Iowa.

to dollar amounts, which a law enforcement officer described as notes consistent with drug transactions. Cf. United States v. Barrow, 287 F.3d 733, 736–37 (8th Cir. 2002) ("Circumstantial evidence such as drug quantity, packaging material, and the presence of cash may be used to establish intent to distribute . . . ."); United States v. Engler, 422 F.3d 692, 696 (8th Cir. 2005) (methamphetamine individually packaged in small gem bags supported an inference that it was intended for distribution). Two of the names or initials on the notepad corresponded to drug-related text messages found on Gensley's phone. None of the names or initials corresponded with the names of witnesses who testified that they had paid Gensley cash for their car repairs. The district court also noted that handwritten notations on the notepad indicating that Gensley owed money to others were inconsistent with his explanation that the cash was received from his car-repair work. Arguably, $4,300 is a relatively small amount of cash to by itself constitute strong evidence of connection with a drug activity. See United States v. $84,615 in U.S. Currency, 379 F.3d 496, 501–02 (8th Cir. 2004) ("[P]ossession of a large amount of cash (here, nearly $85,000) is strong evidence that the cash is connected with drug activity."). But whatever the amount itself may have lacked in probative value was more than adequately supplied by the government's circumstantial evidence that the cash was proceeds of a drug crime and therefore subject to forfeiture. Cf. United States v. Fang, 844 F.3d 775, 779 (8th Cir. 2016) (a reasonable jury could infer intent to distribute from $3,900 in small bills and other circumstantial evidence).

Gensley next argues that the district court erred in determining his base offense level under the Guidelines. Specifically, he contends that the district court clearly erred in finding that he distributed "ice" methamphetamine, see U.S.S.G. § 2D1.1(c), n.(C) (defining "ice" methamphetamine as methamphetamine of at least 80% purity), rather than a methamphetamine mixture. As a result of the district court's finding, Gensley's base offense level was 34, two levels higher than if the methamphetamine had been a mixture. We review for clear error the district court's findings of fact regarding the identity of the drugs attributed to the defendant and *de novo* the district

court's application of the Guidelines. United States v. Walker, 688 F.3d 416, 420 (8th Cir. 2012).

Although most of the methamphetamine attributed to Gensley was not recovered and therefore never tested for purity, we conclude that the government presented sufficient evidence to support the district court's finding that it was "ice" methamphetamine. United States v. Madison, 863 F.3d 1001, 1005 (8th Cir. 2017) ("[C]lear error does not exist just because the district court relied on imprecise information, provided the evidence 'has sufficient indicia of reliability to support its probable accuracy.'" (quoting U.S.S.G. § 6A1.3(a))). The government may prove the purity of methamphetamine by circumstantial evidence and opinion testimony. Walker, 688 F.3d at 423 ("[W]e have consistently rejected arguments demanding direct evidence of drug identity, quantity, or purity."). We have said that "[i]n evaluating whether methamphetamine is 'ice' as defined in the Guidelines, the sentencing court may consider, among other things, the source of the controlled substance, the price generally obtained for the controlled substance, the substance's appearance and form, and reports of the identity and quality of the substance from its users and distributors." Id. at 424 (internal citations and quotation marks omitted).

Gensley's co-conspirator testified that Gensley had received two pounds of "ice" methamphetamine, that Gensley had paid her $10,000 for one pound of methamphetamine, and that the methamphetamine came from Mexico or Arizona. See United States v. Payton, 636 F.3d 1027, 1046 (8th Cir. 2011) ("Coconspirators' testimony 'may be sufficiently reliable evidence upon which the court may base its drug quantity calculation for sentencing purposes.'" (quoting United States v. Plancarte-Vazquez, 450 F.3d 848, 852 (8th Cir. 2006))). Officers seized methamphetamine on six separate occasions from Gensley or a co-conspirator. None of the methamphetamine tested from the conspiracy had a purity rate below 80%. See Plancarte-Vazquez, 450 F.3d at 852 ("When calculating drug quantity . . . , the sentencing court may consider all transactions known or reasonably foreseeable to the

defendant that were made in furtherance of the conspiracy."); Madison, 863 F.3d at 1006–07 (ten quantities seized from the defendant or his suppliers all tested at least 95% pure and could be used as the bases for calculating and using average purity rates). An officer testified that methamphetamine in Iowa during that timeframe was generally 95% pure; that methamphetamine coming out of Mexico was typically purer; and that one pound of pure methamphetamine was valued at $10,000 during 2018. See Madison, 863 F.3d at 1007 (expert testimony that methamphetamine in the area was often 97–99% pure was "a form of circumstantial evidence that bolsters the inferences drawn" from the tested samples). We conclude that there was sufficient circumstantial evidence, including but not limited to the tested samples, for the district court to find it more likely than not that Gensley distributed "ice" methamphetamine. Cf. United States v. Fairchild, 189 F.3d 769, 778 (8th Cir. 1999) (testing evidence from a "small portion . . . minimal in relation to the entire amount of methamphetamine sold" supported the purity finding when combined with conspiracy-participants' testimony).

Gensley's final argument is that the district court plainly erred in denying a downward variance from the calculated Guidelines sentencing range. See United States v. Grimes, 702 F.3d 460, 470 (8th Cir. 2012) (applying plain error review when defendant failed to object below). Gensley points to the district court's statement at sentencing that the defendant had the burden to persuade the court to vary downward and argues that the district court treated the Guidelines range as presumptively reasonable. See Rita v. United States, 551 U.S. 338, 350–51 (2007) (appellate courts may treat the Guidelines range as presumptively reasonable but sentencing courts may not). The district court decided Gensley's sentence in compliance with the procedure laid out in Gall v. United States, 552 U.S. 38, 49–50 (2007) ("[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party."). We find nothing to indicate that the district court treated the Guidelines as presumptively reasonable

in its thorough application of the § 3553(a) factors to the facts.  Id. at 50 ("[The district judge] may not presume that the Guidelines range is reasonable. [The district judge] must make an individualized assessment based on the facts presented." (citation omitted)).  We therefore disagree with Gensley that the district court's statement at sentencing about the burden of persuasion constituted plain error.

The judgment is affirmed.

_____